E.N. v. T.R., No. 44, September Term, 2020

*DE FACTO* **PARENTHOOD – TWO LEGAL PARENTS – CONSENT TO PROSPECTIVE *DE FACTO* PARENT'S FORMATION AND ESTABLISHMENT OF PARENT-LIKE RELATIONSHIP WITH CHILD –** Court of Appeals held that under first factor of test for establishment of *de facto* parenthood—whether biological or adoptive parent consented to, and fostered, petitioner's formation and establishment of parent-like relationship with child—where there are two legal (biological or adoptive) parents, prospective *de facto* parent must demonstrate that both legal parents consented to and fostered such relationship, or that non-consenting legal parent is unfit or exceptional circumstances otherwise exist. To declare existence of *de facto* parentship based on consent of only one legal parent and ignore whether second legal parent has consented to and fostered establishment of parent-like relationship, or is fit parent or whether exceptional circumstances exist undermines parent's constitutional right to care, custody, and control of parent's children. Disregarding whether both legal parents have consented to and fostered prospective *de facto* parent's parent-like relationship with child, or that parent is otherwise unfit or exceptional circumstances exist, runs afoul of parent's constitutional rights and basic family law principles.

Court of Appeals held that legal parent's actual knowledge of and participation in formation of third party's parent-like relationship with child may occur either through parent's express or implied consent to and fostering of relationship. Inquiry into whether legal parent impliedly consented to and fostered potential *de facto* parent's formation of parent-like relationship with child is fact-specific inquiry to be determined on case-by-case basis. Permitting *de facto* parenthood to be established based on express or implied consent of both legal parents, where there are two existing legal parents, or showing of unfitness or exceptional circumstances strikes appropriate balance between parent's fundamental right to raise child and best interest of child.

Court of Appeals held that in this case conduct of one legal parent met the requirement that parent consent to and foster prospective *de facto* parent's formation and establishment of parent-like relationship with children. Court of Appeals held, however, that record demonstrated that second legal parent did not expressly or impliedly consent to and foster prospective *de facto* parent's formation of parent-like relationship with children. As such, although second, third, and fourth factors of *de facto* parent test may have been satisfied, first factor was not, and trial court erred in concluding that person was *de facto* parent to children and in granting person joint legal custody and sole physical custody.

Circuit Court for Prince George's County
Case No. CAD18-04949

Argued: April 13, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 44

September Term, 2020

_____

E.N.

v.

T.R.

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., and Biran, J., dissent.

_____

Filed: July 12, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this case, we must determine the requirements necessary for establishment of *de facto* parenthood in Maryland where a child has two legal parents, specifically, whether both parents must consent to, and foster, a prospective *de facto* parent's formation and establishment of a parent-like relationship with the child. The term "*de facto* parent" means "parent in fact" and is used to describe a party, other than a child's legal parent, *i.e.*, biological or adoptive parent, who claims custody or visitation rights based upon the party's relationship with a non-biological, non-adopted child. Conover v. Conover, 450 Md. 51, 62, 68 n.12, 146 A.3d 433, 439, 443 n.12 (2016).[1] In Conover, id. at 85, 74, 146 A.3d at 453, 446-47, a case involving one biological parent, this Court recognized *de facto* parenthood in Maryland and adopted a four-factor test set forth by the Supreme Court of Wisconsin in In re Custody of H.S.H.-K., 533 N.W.2d 419, 421, 435-36 (Wis. 1995), under which a person seeking *de facto* parent status must prove the following when petitioning for custody of or visitation with a child:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and
>
> (4) that the petitioner has been in a parental role for a length of time sufficient

---

[1]In Conover, 450 Md. at 67-68 & n.12, 146 A.3d at 442-43 & n.12, we observed that the "term 'psychological parent' is closely related to the '*de facto* parent' label in that the[] designations are used to describe persons who have assumed a parental role" and that the terms are used interchangeably in other jurisdictions.

to have established with the child a bonded, dependent relationship parental in nature.

Conover, 450 Md. at 74, 146 A.3d at 446-47 (quoting H.S.H.-K., 533 N.W.2d at 435-36).

The circumstances of Conover, id. at 54-55, 146 A.3d at 435, involved a same-sex couple and a dispute over one spouse's right of access to a child conceived by artificial insemination. The child was born before the couple was married, one spouse was the biological mother of the child (the child's birth certificate did not identify a father) and the other spouse was not the adoptive parent of the child. In other words, Conover concerned a custody dispute where there was only one legal parent and a third party sought *de facto* parent status. In Conover, this Court issued a majority opinion and two concurring opinions. One concurring opinion, id. at 87-88, 146 A.3d at 454-55, expressed concerns about the possible implications of the Majority's holding in situations in which there are two legal parents and a prospective *de facto* parent:

> By adopting the four-factor test set forth in H.S.H.-K., 533 N.W.2d at 435, the Majority holds that, under the first factor, when seeking *de facto* parent status, the third party must show "that the biological or adoptive parent consented to, and fostered, the third party's formation and establishment of a parent-like relationship with the child." In other words, the Majority holds that only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent. This will work in cases such as this one, where a second biological or adoptive parent does not exist, *i.e.*, where there is only one existing parent. Where there are two existing parents, however, permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created. Such situations may result in a child having three parents vying for custody and visitation, and being overburdened by the demands of multiple parents. Today, many children are not living in a classic nuclear family. Families include not only same-sex married parents—in which one parent had a child before marriage—but also separated or divorced parents who conceived children during a marriage, as well as two parents who have never married. The

> Majority has written broadly a solution for *de facto* parents that will serve couples well under circumstances similar to the parties in this case, where there is only one biological or adoptive parent. The majority opinion, however, will have greater consequences in cases for children with two existing parents because a *de facto* parent request may occur without the knowledge or consent of the second existing parent. Children who already have difficulty with visitation schedules, or experience custody issues pertaining to two parents, will not be served well by the creation of a test that does not account for the second existing parent's knowledge and consent.

(Watts, J., concurring). The concerns expressed in the concurring opinion in <u>Conover</u> are squarely before the Court in this case and we must now address the question of where there are two legal parents whether both legal parents must consent to and foster a third party's formation and establishment of a parent-like relationship with a child under the first factor of the <u>H.S.H.-K.</u> test. After careful consideration, we answer the question in the affirmative.

In this case, E.N., Petitioner, is the biological mother of two minor children, G.D. and B.D. D.D. is the biological father of the children. The four lived together as a family until late 2009, when D.D. was incarcerated for drug offenses. Thereafter, the children lived with E.N. and E.N.'s mother, their maternal grandmother. In late 2013, D.D. was released from prison and entered into a new relationship with T.R., Respondent, to whom he was engaged at the time of the trial in this case. In 2015, D.D. and T.R. purchased a home together and later that year the children moved in with the couple. The children lived with D.D. and T.R. until late 2017, when D.D. was incarcerated again for drug offenses, this time in a federal prison in Pennsylvania. After D.D.'s incarceration, the children continued to live with T.R. In November 2017, while T.R. and the children were visiting the children's paternal grandparents, E.N. arrived and sought the return of her children.

- 3 -

E.N. was rebuffed by T.R. and law enforcement officers were called to the house. The children returned from the grandparents' home to T.R.'s house the following day. In February 2018, T.R. filed in the Circuit Court for Prince George's County a complaint for custody, seeking sole legal and physical custody of the children. E.N. filed a counter-complaint, seeking sole legal and physical custody of the children. Following a five-day trial on the merits, the circuit court granted T.R.'s complaint for custody and denied E.N.'s complaint. Despite expressly determining that E.N. did not consent to or foster the children's relationship with T.R. or even know T.R., the circuit court concluded that the four factors of the H.S.H.-K. test were satisfied and T.R. was a *de facto* parent of the children. The circuit court granted joint legal custody of the children to T.R. and E.N., with tie-breaking authority awarded to T.R., and granted sole physical custody of the children to T.R., with visitation for E.N., the children's biological mother.

E.N. appealed and the Court of Special Appeals affirmed the circuit court's judgment. See E.N. v. T.R., 247 Md. App. 234, 252, 236 A.3d 670, 680 (2020). The Court of Special Appeals held "that a *de facto* parent relationship may be established by the conduct of only one legal parent" even where there are two extant legal parents and that a *de facto* parent has an equal fundamental constitutional right with the legal parents concerning the care, custody, and control of a child. Id. at 237, 247, 236 A.3d at 672, 678. E.N. filed in this Court a petition for a writ of *certiorari*, which we granted. See E.N. v. T.R., 471 Md. 519, 242 A.3d 1117 (2020).

Against this background, we must decide whether, where there are two existing legal parents, a *de facto* parent relationship may be created through the fostering and

consent of only one legal parent to the formation of such a relationship, without the consent of the second legal parent. We hold that, under the first factor of the H.S.H.-K. test adopted by this Court in Conover for establishment of *de facto* parenthood, to establish *de facto* parenthood, where there are two legal (biological or adoptive) parents, a prospective *de facto* parent must demonstrate that both legal parents consented to and fostered a parent-like relationship with a child, or that a non-consenting legal parent is an unfit parent or exceptional circumstances exist.

In this case, it is clear that, although D.D. may have consented to and fostered T.R.'s formation and establishment of a parent-like relationship with his and E.N.'s children, E.N. did not consent to and foster the relationship between her children and T.R., (or even know T.R.) and T.R. did not establish that E.N. was unfit or that exceptional circumstances existed such that T.R. could be declared a *de facto* parent. Because T.R. failed to satisfy the first factor of the H.S.H.-K. test, the circuit court erred in concluding that she was a *de facto* parent to the children and in granting her joint legal custody and sole physical custody. As such, we reverse the judgment of the Court of Special Appeals, which affirmed the circuit court's judgment.

### BACKGROUND

E.N. and D.D. are the biological parents of two minor children, G.D. and B.D., a daughter and son who were born in 2005 and 2007, respectively.[2] From 2005 until

---

[2]We summarize the pertinent factual background from the circuit court's Memorandum Opinion and Order, issued on June 24, 2019, focusing primarily on the residential history of the children. On brief in this Court, E.N. advises that, although she

approximately October 2009, E.N. and D.D. lived together with the children in an apartment in Upper Marlboro, Maryland. In October 2009, D.D. was incarcerated following entry of a guilty plea in the Circuit Court for Prince George's County to possession with intent to distribute and possession of a firearm with a nexus to drug trafficking. D.D. was sentenced to fifteen years' imprisonment, with all but five years suspended, for possession with intent to distribute, and a concurrent five years' imprisonment for the firearm charge. After D.D. was incarcerated, E.N. and the children lived with E.N.'s mother, the children's maternal grandmother.

Approximately four years later, in October 2013, D.D. was released from prison. Around the same time, D.D. began a relationship with T.R. and the two moved in together. The children began visiting with D.D. and T.R. almost every weekend. In 2015, D.D. and T.R. bought a home together. E.N. was aware that D.D. had a romantic partner, but she did not know the woman's identity or where the woman resided. Although the children lived with E.N. and her mother from late 2013 to 2015, according to the circuit court, during this time period, E.N. "was not an involved parent and demonstrated little parental responsibility for the children."

In June 2015, the children moved into D.D. and T.R.'s house, mainly because the children wanted to spend more time with D.D. To help facilitate the move, E.N. signed paperwork to permit the children to transfer from the school that they had been attending

"does not agree with some of the" findings of fact made by the circuit court in the memorandum opinion, she acknowledges that she is bound by the factual findings of the circuit court and does not challenge them.

to a school in D.D.'s school district. E.N. did not object to the move because she "needed a break" "to get herself right." After the move, D.D. identified T.R. as an emergency contact for the children with their new school. The children continued to live with D.D. and T.R. until late 2017, when law enforcement officers raided the home and found three firearms, ammunition, and a significant amount of cocaine. D.D. was convicted in federal court of possession with intent to distribute cocaine and possession of firearms related to drug trafficking and sentenced to a total of ten years' imprisonment. At the time of trial in this case, D.D. was serving his sentence at a federal prison in Pennsylvania and his approximate release date is August 2024. T.R. and the children were reportedly unaware of D.D.'s criminal activity and that drugs and guns were located in the home. From June 2015 to late 2017, while the children were living with D.D. and T.R., E.N. saw the children once, in the spring of 2017, when she took the children out to dinner with their grandparents. In addition, the circuit court found that "there was evidence that [E.N.] attempted to locate her children a few times in order to retrieve them and bring them home."

After D.D. was incarcerated in 2017, the children continued to live with T.R. In November 2017, while T.R. and the children were visiting with the children's paternal grandparents, E.N. went to the grandparents' home and asked for her children to be returned to her. T.R. refused. Law enforcement officers were called to the home to diffuse the situation. The children stayed the night at the grandparents' home but returned to T.R.'s home the following day. E.N. did not see or have contact with the children again until September 2018, when the trial in the case began.

## Circuit Court Proceedings

On February 16, 2018, T.R., proceeding *pro se*, filed in the circuit court a complaint against E.N. and D.D., seeking sole legal and physical custody of the children. In the complaint, T.R. alleged that the children had lived with her for the preceding three years and that they had no contact with E.N. In support of the complaint, T.R. included a letter from D.D., dated November 30, 2017. The entirety of the letter consisted of the following sentence: "I[, D.D.,] grant full custody to T.R. for my two children[,] GD 12 years old and BD 10 years old[,] for legal guardianship[3] while I'm incarcerated." The letter was signed by D.D. and notarized.[4]

On March 12, 2018, E.N., proceeding *pro se*, filed an answer to the complaint, a counter-complaint for custody, and a motion for emergency relief. In the answer, which was a circuit court form answer, E.N. denied all of the allegations in the complaint and checked the box requesting that the circuit court dismiss or deny the complaint. In the counter-complaint, E.N. alleged that she should be granted sole legal and physical custody of her children, without visitation by D.D. because he was incarcerated. In the motion for emergency relief, E.N. sought an immediate order directing T.R. to return the children, stating that she had no contact with her children and alleging that D.D. and T.R. were hiding the children from her and that she knew the children were in danger. The circuit court denied the motion for emergency relief.

---

[3]In the letter, D.D. did not expressly seek or consent to *de facto* parenthood for T.R. and limited the request for legal guardianship to the period of his incarceration.

[4]D.D. did not file an answer to the complaint for custody.

On June 8, 2018, T.R., still proceeding *pro se*, filed an answer to the counter-complaint. T.R. acknowledged that E.N. was the mother of G.D. and B.D. but denied that it was in the children's best interest for E.N. to be granted custody. On September 10, 2018, an attorney entered an appearance on T.R.'s behalf.

On September 13, 2018, the circuit court began a trial on the merits of the complaint and counter-complaint. D.D. did not participate in the trial that day. During opening statements, for the first time, T.R.'s counsel advised the circuit court that T.R. sought *de facto* parent standing under Conover. E.N., still proceeding *pro se*, advised the circuit court that she had made attempts to see her children but D.D. and T.R. kept the children away from her and that she was fighting for the return of her children. T.R. began her case-in-chief by calling E.N. as her first witness. After direct examination ended, E.N. was not offered an opportunity to give testimony by way of cross-examination. T.R. was unable to finish her case-in-chief that day, so the circuit court scheduled trial to resume on November 19 and 20, 2018. In light of the delay in resuming the trial, the circuit court issued a *pendente lite* order granting E.N. visitation with the children. In addition, the circuit court directed T.R. to bring the children to court with her on November 19, 2018 for the court to interview the children *in camera* alone.[5]

On November 19, 2018, T.R. and E.N. appeared with counsel for the continuation

---

[5]On October 24, 2018, T.R. filed a motion seeking the appointment of a custody evaluator. On November 8, 2018, an attorney entered an appearance on E.N.'s behalf. E.N., through counsel, filed an opposition to the motion seeking the appointment of a custody evaluator, and the circuit court denied the motion.

of the trial. D.D. appeared telephonically from federal prison. Before resuming trial, the circuit court conducted separate *in camera* interviews of the children. Following the interviews, when the case was called, E.N.'s counsel objected to the *in camera* interviews occurring before the circuit court had received all of the evidence in the case. The circuit court overruled the objection, reasoning that it had planned to interview the children before E.N. retained counsel. The circuit court advised that a court reporter had been present during the interviews and that transcripts could be obtained, and the court summarized on the record statements it attributed to each child.[6]

Trial resumed the next day. D.D. testified, among other things, that, starting in the summer of 2013, the children began staying with him every weekend, rather than every other weekend. According to the circuit court, D.D. testified that, while living with E.N. and her mother, the children would wear dirty clothes to school, ate "unhealthy and non-homecooked meals every day for dinner[,]" and slept on a couch in the basement of the home. D.D. testified that he developed concerns about the children living with E.N. and talked with her about having the children move in with him. In the spring of 2015, E.N. signed school transfer paperwork to facilitate the move. As for his relationship with T.R., D.D. testified that he and T.R. began living together in late 2013. D.D. testified that he never introduced T.R. to E.N. D.D. testified that E.N. knew of T.R., though, and referred

___

[6]According to the circuit court's memorandum opinion, when interviewed individually *in camera* both children testified that "their relationship with [T.R.] was fantastic, that they felt loved by her like a mother, and wanted to remain living with her[.] Specifically, B.D. stated: who wouldn't want to live in a nice, clean, loving environment; who wants to go back to roaches, dirty clothes, and sharing a blanket where you don't feel loved?"

to T.R. as his "girlfriend."  D.D. eventually had a conversation with E.N., advising her that he and T.R. were in a relationship and that the children "[we]re around" T.R.  D.D. testified that E.N. did not express any concerns at that time.  As to T.R.'s relationship with the children, D.D. testified that the relationship was "out of this world" and that he is happy that the children "are around her and experiencing the good things that she offers to them."

Without referencing either *de facto* parent status or legal guardianship, T.R.'s counsel asked D.D. about the letter he wrote purporting to give full custody of the children to T.R. while he was incarcerated.  D.D. responded that he and T.R. plan to get married and that T.R. has been around the children and knows them.  D.D. testified that T.R. is financially able to take care of the children and that he can maintain his relationship with the children while incarcerated.  D.D. testified that he believed that T.R. was the best person to handle things that might arise medically with the children and that she was the person best able to provide for the children.

On cross-examination, D.D. confirmed that, in 2009, he had been convicted of possession with intent to distribute a controlled dangerous substance and possession of a firearm in a drug trafficking crime in the circuit court and sentenced to fifteen years' imprisonment, with all but five years suspended.  D.D. also confirmed that, in 2017, he had been convicted in the United States District Court for the District of Maryland for possession with twenty grams or more of cocaine base and heroin with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime and sentenced to sixty months' imprisonment for each consecutively.  In addition, D.D. confirmed that a search and seizure warrant had been executed at the house that he and T.R. shared with the

- 11 -

children and the cocaine, heroin, and three firearms that he was convicted of possessing were recovered from the house. D.D. testified that after the children came to live him and T.R. in June 2015, E.N. could have come and picked up the children and spent time with them "any time she asked[.]" D.D. acknowledged that he wrote the letter dated November 30, 2017 purporting to grant T.R. full custody of the children for legal guardianship while he was incarcerated. D.D. agreed that he wrote the letter without consulting E.N. and did not give E.N. a copy of the letter.

On redirect examination, D.D. denied that he had been keeping the children away from E.N. after 2015 and indicated that he wrote the letter of November 30, 2017 because he felt E.N. was incapable of raising the children. After D.D. was called as a witness by T.R. and cross-examined by E.N.'s counsel, the circuit court asked D.D. if there were any questions he would like to ask himself.[7] D.D. responded by, among other things, describing himself as a wonderful father in spite of his "criminal activities" and stating that he has taught his children "morals and responsibilities." Neither during the examination of D.D. by the parties' attorneys nor during D.D.'s questioning of himself did D.D. reference or request that T.R. be made a *de facto* parent.

At the close of T.R.'s case, E.N.'s counsel moved for judgment on the ground that T.R. had failed to present evidence that E.N. was unfit or that there were exceptional circumstances. T.R.'s counsel opposed the motion, citing <u>Conover</u> and asserting that T.R. was entitled to *de facto* parent standing. The circuit court denied the motion for judgment

---

[7]T.R. identified D.D. as a defendant in the case.

and stated:

> And I want to -- a couple of things. In the light most favorable concerning de facto parent, in the light most favorable, the Plaintiff has established that, but that's only in the light most favorable. We still have the -- as [E.N.'s counsel] mentioned, we still have the negative parts and things along those lines.
>
> But we -- if you go over the hurdle for the de facto parent, then you go to the best interest standards. I'm not sure that everybody's had enough time to put on their best interest for the child standards.

Because the trial had not concluded, the circuit court scheduled an additional trial day—April 4, 2019. The trial resumed that day and E.N.'s mother testified on E.N.'s behalf. According to the circuit court, E.N.'s mother testified that, during the time the children lived with her, their clothes were clean and she contested the allegation that the children slept on a couch in the basement. The circuit court scheduled additional trial dates for May 29 and 30, 2019. T.R. and E.N. appeared on May 29, 2019, but D.D. was unavailable. On May 30, T.R., E.N., and D.D. appeared for trial. E.N. testified on her own behalf, D.D. called his father as a witness, and T.R. testified as a rebuttal witness. At the close of all of the evidence, the circuit court heard closing argument from the parties.

On June 24, 2019, the circuit court issued a Memorandum Opinion and Order, granting T.R.'s complaint for custody and denying E.N.'s counter-complaint for custody. The circuit court concluded that T.R. was a *de facto* parent of the children and, as such, had standing to bring the complaint for custody and that it was in the best interest of the children to award her custody. Specifically, the circuit court awarded T.R. and E.N. joint legal custody of the children and awarded T.R. tiebreaker authority. In addition, the circuit court awarded T.R. sole physical custody of the children, with E.N. being given visitation

- 13 -

at specified times.[8]

In so awarding, the circuit court stated that the first factor of the H.S.H.-K. test was "undoubtedly the most important." The circuit court determined that, although E.N. "was absent in the minor children's lives since June 2015[,]" that absence did not automatically mean that E.N. consented to the formation of a *de facto* parent relationship between the children and T.R., as "E.N. could not consent because she lacked knowledge of T.R.'s existence and importance in the lives of the minor children." The circuit court explained:

> Demonstratively, a parent is unable to consent and foster a de facto parent relationship by being absent and doing nothing. Here, E.N. was absent from the children's lives since June 2015 and testified that she did not consent to this parental relationship. Implied consent does not meet the burden to satisfy prong one of the *Conover* test. . . . [T]he consent needs to be express and explicit.
> Moreover, even though E.N. knew that [D.D.] had a romantic partner, she did not positively identify her, know her, or meet her until November 2017, more than two years into the living arrangement, when E.N. attempted to retrieve her children. In addition, there was evidence that E.N. attempted to locate her children a few times in order to retrieve them and bring them home.
> Furthermore, in this case, E.N. filed a counter complaint asking the Court to award her sole legal and physical custody directly opposing T.R.['s] request.

---

[8]The circuit court's order set forth T.R.'s and E.N.'s entitlement to access to the children as follows: during the school year, E.N. would have visitation with the children on the first, third, and fourth weekends of every month, from 6:00 p.m. on Fridays until 6:00 p.m. on Sundays. During the summer (which would be the Sunday after the children's last day of school until the Sunday before the children restarted school in the fall), E.N.'s access would be on an alternating weekly basis from Sunday to Sunday at 6:00 p.m., with T.R. having the first week after the children's last day of school. As to holidays, E.N. was given access on Thanksgiving break during odd years beginning in 2019, winter break and Christmas during even years beginning in 2020, each spring break, each Mother's Day, and alternating years for each child's birthday. T.R. was given access for each Father's Day.

Despite concluding that E.N. did not consent to or foster the children's relationship with T.R., the circuit court nonetheless concluded that <u>Conover</u> "allows a *de facto* parent relationship to be formed through the consent of only one parent, and once that relationship is formed, it may not be severed unless it is in the best interest of the child." The circuit court determined that "the *de facto* test does not take into consideration which parent consented—the only item that matters is that a parent consented." (Cleaned up). Utilizing this rationale, the circuit court concluded that "there was consent by a biological parent to satisfy the first prong, i.e., consent by the biological father," D.D.

The circuit court stated that there was "much testimony" showing that D.D. consented to the parent-like relationship between T.R. and the children. Among other things, the circuit court stated:

> [D.D.] and T.R. would help the children with their homework and school work, buy them food and clothes, bring them to their medical appointments. There was even testimony that T.R. was listed as an emergency contact in the school for the minor children. Furthermore, there was testimony that T.R. would plan celebrations for the children on their birthdays and special accomplishments.
> Lastly, and most importantly, there was testimony that the children's relationship really started to blossom and grown into a parent-like relationship in [or] about 2016, before [D.D.] was arrested on his current drug charges. This is thus indicative of [D.D.]'s participation and fostering of the parent-like relationship. Indeed, even while still incarcerated, [D.D.] continues to consent to the parent-caliber relationship between the children and [T.R.]—and even submitted a document to the Court stating his desire for [T.R.] to have custody of the minor children.

The circuit court concluded:

> The Court finds that this constitutes the knowing participation by a biological parent required to establish a *de facto* parent relationship between [T.R.] and the minor children. There is no dispute that T.R. cared for and supported the children with no expectation of financial compensation. And given the

- 15 -

testimony, the Court finds that T.R.'s substantial degree of influence, care, and support of the children was, without question, consented to and fostered by [D.D.] The record makes clear that [D.D.] consented to and fostered T.R. assuming and acting in a parental role toward the minor children's lives. Therefore, T.R. satisfies the first prong of the *Conover* test. . . . All of the actions pertaining to expressed consent were performed by [D.D.] Likewise, E.N. did not know where her children were and did not see them for three years. And as explained above, because of E.N.'s absence, she lacked the required knowledge and voluntariness required to expressly consent and foster a *de facto* parent relationship.

(Emphasis omitted).

As to the other factors of the test for creation of a *de facto* parent relationship, the circuit court concluded that, because the children had lived in the same household as T.R. since June 2015, the second factor was satisfied. As to whether T.R. assumed obligations of parenthood without expectation of financial compensation, the circuit court concluded that the factor was satisfied, as "T.R.'s unrefuted testimony demonstrates that she took significant responsibility for the minor children's care, education, and development, and contributed to their support, without any expectation of compensation." The circuit court concluded that T.R. also satisfied the fourth factor—being "in a parental role for a sufficient amount of time to develop a parental caliber relationship"—because T.R. had shown that "she had developed a parental bond with the minor children since at least the summer of 2016." (Cleaned up). The circuit court ultimately concluded that, because T.R. satisfied all four factors of the H.S.H.-K. test, T.R. was a *de facto* parent and that "her status in th[e] dispute over custody [wa]s equal to that of E.N."

The circuit court next employed the best interest of the child standard to determine the issue of custody. Among other things, the circuit court concluded that it was

"uncontested that all parents are fit; there was no evidence to the contrary presented through the five days of trial." The circuit court specifically determined that there had been "no voluntary abandonment or surrender of the children." As to the financial status of the parents, the circuit court determined that T.R. earns an annual salary of $86,000, that E.N. makes $12.50 per hour, and that D.D. is incarcerated and not working. The circuit court determined that the children would "benefit from having all three parties [E.N., D.D., and T.R.] in their lives. T.R. is an integral part of the well-being of the two minor children. She takes full responsibility for the children and the children have bonded and established a parent-child relationship with her."

E.N. noted an appeal.

### Opinion of the Court of Special Appeals

On August 25, 2020, in a reported opinion, the Court of Special Appeals affirmed the circuit court's judgment. See E.N., 247 Md. App. at 252, 237, 236 A.3d at 680, 672. The Court of Special Appeals held that, where there are two extant legal parents, "a *de facto* parent relationship can be created by only one legal parent consenting to and fostering a parent-like relationship with a putative *de facto* parent." Id. at 247, 236 A.3d at 677. In so holding, the Court of Special Appeals relied largely on Conover and one of the concurring opinions in Conover. See id. at 241, 236 A.3d at 674. The Court of Special Appeals stated: "In its most literal sense, *Conover* held that the conduct of one legal parent could create a *de facto* parent relationship between a third party and a child. But because there was only one legal parent in *Conover*, the Court was not required to, and indeed did not, address the issue presented here." Id. at 242, 236 A.3d at 674 (footnote omitted).

The Court of Special Appeals relied in part on the circumstance that the Majority in Conover "did not respond to" the "specific and substantive concerns" expressed by the concurrence, which, in the Court of Special Appeals's view, "provide[d] at least some evidence that the Court of Appeals did not disagree with [the concurring opinion's] interpretation of the majority opinion." Id. at 246, 236 A.3d at 677. The Court of Special Appeals cited cases in which majority opinions of this Court responded to concurring and dissenting opinions, stating that "it is not uncommon for the Court of Appeals's majority opinion to respond to issues raised in concurring and dissenting opinions." Id. at 246-47, 236 A.3d at 677 (cleaned up). The Court of Special Appeals determined that, in this case, the circuit court did not err in concluding that T.R. was a *de facto* parent of the children based on one parent's interaction with her, namely, D.D.'s "conduct in creating a parent-like relationship between T.R. and the children." Id. at 247, 236 A.3d at 677 (footnote omitted).

The Court of Special Appeals reasoned that E.N.'s due process rights were not constitutionally infringed upon where E.N. neither consented to nor fostered the *de facto* parent relationship "because, once T.R. achieved *de facto* parenthood status, T.R. qualified as a 'legal parent' entitled to co-equal fundamental constitutional protections." Id. at 249, 236 A.3d at 679. The Court of Special Appeals concluded that "such a rule strikes the proper balance between parents' fundamental rights to care for their children and the children's fundamental rights to be placed with caregivers who will promote their best interests." Id. at 249, 236 A.3d at 679 (citations omitted). The Court of Special Appeals addressed the circuit court's best interest determination and held that the circuit court

conducted a "thorough review of the relevant custody factors" and that it did not abuse its discretion in awarding primary physical custody of the children to T.R.  Id. at 252, 236 A.3d at 680.[9]

<strong>Petition for a Writ of <em>Certiorari</em></strong>

On September 25, 2020, E.N. petitioned for a writ of *certiorari*, raising the following issue:

> When a *de facto* parentship is formed and fostered at the behest of one legal parent without the knowledge or consent of the other legal parent, does the non-consenting parent retain her superior claim to custody, protected by the substantive component of the Fourteenth Amendment Due Process Clause, against the *de facto* parent, thereby requiring the *de facto* parent to prove that the non-consenting parent is unfit or that exceptional circumstances exist?

On December 7, 2020, this Court granted the petition.  See E.N., 471 Md. 519, 242 A.3d 1117.

<strong>DISCUSSION</strong>

<strong>The Parties' Contentions</strong>

E.N. contends that a fit legal parent is entitled to custody of her children over a third party asserting *de facto* parentship where the objecting fit legal parent neither consented to nor fostered the *de facto* parentship formed on account of the other legal parent.  E.N. argues that a legal parent has a fundamental, constitutional right to the care and custody of the parent's child, such that the parent is entitled to raise the "child without being subjected to litigation brought by the government or a third party unless the legal parent is unfit or

---

[9]The Court of Special Appeals did not expressly address the award of joint legal custody to T.R. and E.N.

- 19 -

exceptional circumstances make custody with the parent detrimental to the best interests of the child." E.N. asserts that both the circuit court and Court of Special Appeals incorrectly applied the multi-factor test for *de facto* parentship set forth in <u>Conover</u> by concluding that a *de facto* parent relationship may be established by the conduct of only one legal parent where there are two legal parents. E.N. maintains that, where there are two legal parents, the holding in <u>Conover</u> "does not eliminate the requirement that a third party prove unfitness or exceptional circumstances against a legal parent" who did not consent to or foster the *de facto* parent relationship.

With respect to the circumstances of this case, E.N. points out that, as to the first factor of the *de facto* parent test, the circuit court expressly determined that she did not consent to or foster the formation and establishment of the *de facto* parent relationship between T.R. and the children. E.N. also points out that the circuit court concluded that she is a fit parent who did not voluntarily abandon her children and T.R. has not proven that exceptional circumstances exist. E.N. maintains that, properly applying <u>Conover</u>, the circuit court should have denied T.R. standing to seek custody. E.N. maintains that "[a] third party does not qualify for *de facto* parenthood standing against a legal parent who did not participate in the formation or establishment of the *de facto* parent, . . . regardless of whether the *de facto* parent has a better home, job, and appears to be acting with benevolence."

T.R. responds that the Court of Special Appeals correctly held that a *de facto* parent relationship may be established where one biological parent consents to the fostering of the relationship and the other biological parent is absent from a child's life for a period of

years.  T.R. argues that the circumstances of this case demonstrate "intentional actions" by E.N. "that at the very least reflect implied consent to the fostering of a *de facto* parentship between" her (T.R.) and the children.  T.R. maintains that D.D. gave express consent to *de facto* parenthood for her by writing a letter purporting to grant full custody of the children to her while he is incarcerated.  According to T.R., E.N. gave implied consent when she, with the knowledge of D.D.'s incarceration, "chose to be absent and unavailable to care for the minor children—thereby creating the space to allow [T.R.] to give parental care to the minor children."

Although T.R. acknowledges that the circuit court did not find E.N. to be an unfit parent, she maintains that the following exceptional circumstance exists: "the strong and potent parental affection that is to lead to desire and efforts to care properly for and raise the child did not come in the form of the biological mother, based upon the testimony of the minor children."  (Cleaned up).  According to T.R., "[t]his is an exceptional circumstance in that it is not typical."

**Standard of Review**

Maryland Rule 8-131(c) provides that, "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence."  The appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. R. 8-131(c).  "When a trial court decides legal questions or makes legal conclusions based on its factual findings, we review these determinations without deference to the trial court." Plank v. Cherneski, 469 Md. 548, 569, 231 A.3d 436,

448 (2020) (cleaned up).  As such, "[w]here a case involves the application of Maryland statutory or case law, our Court must determine whether the [trial] court's conclusions are legally correct under a *de novo* standard of review."  Id. at 569, 231 A.3d at 448 (cleaned up).

### Family Law Principles, Parental Unfitness, and Exceptional Circumstances

It is "well[ ] established that the right[] of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution."  Conover, 450 Md. at 60, 146 A.3d at 438 (citations omitted).  In In re Yve S., 373 Md. 551, 565, 819 A.2d 1030, 1038 (2003), this Court explained: "Certain fundamental rights are protected under the U.S. Constitution, and among those rights are a parent's Fourteenth Amendment liberty interest in raising his or her children as he or she sees fit, without undue influence by the State."  (Footnote omitted).  The Supreme Court of the United States "has deemed the right to rear a child essential and encompassed within a parent's basic civil rights."  Id. at 566, 819 A.2d at 1039 (cleaned up).  In Troxel v. Granville, 530 U.S. 57, 65 (2000), the Supreme Court stated in no uncertain terms that the liberty "interest of parents in the care, custody, and control of their children[ ] is perhaps the oldest of the fundamental liberty interests recognized by this Court."  Moreover, we have recognized that the "best interests of the child standard embraces a strong presumption that the child's best interests are served by maintaining parental rights" and the Supreme Court has "placed its imprimatur on the presumption that parents act in the best interests of their children[.]"  In re Yve S., 373 Md. at 571-72, 819 A.2d at 1042 (citations omitted).

Importantly, "Maryland has consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified." Id. at 566, 819 A.2d at 1039 (citations omitted). Although there may be "some tension inherent amongst the[] deep-rooted principles" of the best interest of the child and the fundamental right of a parent to raise a child as the parent sees fit, Conover, id. at 60, 146 A.3d at 438, in McDermott v. Dougherty, 385 Md. 320, 353, 869 A.2d 751, 770 (2005), this Court recognized:

> Where the dispute is between a fit parent and a private third party, [] both parties do not begin on equal footing in respect to rights to "care, custody, and control" of the children. The parent is asserting a fundamental constitutional right. The third party is not. A private third party has no fundamental constitutional right to raise the children of others.

In other words, "the rights of parents to custody of their children are generally superior to those of anyone else[.]" Conover, 450 Md. at 60, 146 A.3d at 438.

As such, we have "held that a third party seeking custody or visitation must first show unfitness of the natural parents or that extraordinary circumstances exist before a trial court could apply the best interests of the child standard." Id. at 61, 146 A.3d at 438 (citations omitted); see also Burak v. Burak, 455 Md. 564, 624, 168 A.3d 883, 918 (2017) (The Court held "that for a third-party to have standing to intervene in a custody action, he or she must plead sufficient facts that, if true, would support a finding of either parental unfitness or the existence of exceptional circumstances and demonstrates that the best interests of the child would be served in the custody of the third-party."). In McDermott, 385 Md. at 325, 869 A.2d at 754, we held:

> [I]n disputed custody cases where private third parties are attempting to gain

custody of children from their natural parents, the trial court must first find that both natural parents are unfit to have custody of their children or that extraordinary circumstances exist which are significantly detrimental to the child remaining in the custody of the parent or parents, before a trial court should consider the 'best interests of the child' standard as a means of deciding the dispute.

Similarly, in Koshko v. Haining, 398 Md. 404, 444-45, 921 A.2d 171, 195 (2007), a case involving a grandparent visitation statute, we held "that there must be a finding of either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child, absent visitation from his or her grandparents, as a prerequisite to application of the best interests analysis." We held that the grandparent visitation statute was unconstitutionally applied to the petitioners in that case "in the absence of a threshold finding of parental unfitness or exceptional circumstances[.]" Id. at 445, 921 A.2d at 195.

We have explained that, in custody cases, "unfitness means an unfitness to have custody of the child, not an unfitness to remain the child's parents; exceptional circumstances are those that would make parental custody detrimental to the best interest of the child." In re Adoption/Guardianship of H.W., 460 Md. 201, 217, 189 A.3d 284, 293 (2018) (cleaned up). This is in contrast to termination of parental rights cases. Indeed, "[f]acts that might demonstrate unfitness or exceptional circumstances in a custody case are not always sufficient to terminate parental rights." Id. at 217, 189 A.3d at 293.[10] Additionally, we have stated that, with respect to "ordinary custody cases[,]" as opposed

---

[10]In H.W., 460 Md. at 217, 189 A.3d at 293, this Court explained that, to justify a decision to terminate parental rights, the focus is "on the continued parental relationship, not custody[,]" and "[t]he facts must show that the parent is unfit to continue the relationship, or exceptional circumstances make the continued relationship detrimental to the child's best interests." (Cleaned up).

to termination of parental rights cases, the General Assembly "has carefully circumscribed the near-boundless discretion that courts have . . . to determine what is in the child's best interests." Id. at 218, 189 A.3d at 293 (cleaned up). More recently, in Burak, 455 Md. at 648, 168 A.3d at 932, this Court elaborated on factors that are relevant to a trial court's "inquiry into whether a parent is unfit sufficient to overcome the parental presumption in a third-party custody dispute[,]" stating that, in determining whether a parent is unfit, a trial court

> may consider whether: (1) the parent has neglected the child by manifesting such indifference to the child's welfare that it reflects a lack of intent or an inability to discharge his or her parental duties; (2) the parent has abandoned the child; (3) there is evidence that the parent inflicted or allowed another person to inflict physical or mental injury on the child, including, but not limited to physical, sexual, or emotional abuse; (4) the parent suffers from an emotional or mental illness that has a detrimental impact on the parent's ability to care and provide for the child; (5) the parent otherwise demonstrates a renunciation of his or her duties to care and provide for the child; and (6) the parent has engaged in behavior or conduct that is detrimental to the child's welfare. Addressing the second factor, we conclude that "neglect" for the purposes of a finding of unfitness means that the parent is either unable or unwilling to provide for the child's ordinary comfort or for the child's intellectual and moral development.

We added that these factors "are not the exclusive criteria [on] which a court must rely to determine whether a parent is unfit, but should[ ] serve as a guide for the court in making its findings." Id. at 649, 168 A.3d at 932.[11] And, importantly, even if a parent is found to be unfit and custody is granted to a third party based on a trial court's finding that such placement is in the child's best interest, the parent "is not foreclosed from seeking to regain

---

[11]In Burak, 455 Md. at 649, 168 A.3d at 932, we explained that in a third-party custody dispute, "our precedent establishes that [] evidence" of parental unfitness "may be shown by a [] preponderance of the evidence." (Citations omitted).

custody of his or her child in the future upon a showing of changed circumstances." Id. at

649, 168 A.3d at 933 (citation omitted).

As to exceptional circumstances, in McDermott, 385 Md. at 419, 869 A.2d at 809,

we identified the factors pertinent to such a finding:

> The factors which emerge from our prior decisions which may be of
> probative value in determining the existence of exceptional circumstances
> include the [1] length of time the child has been away from the biological
> parent, [2] the age of the child when care was assumed by the third party, [3]
> the possible emotional effect on the child of a change of custody, [4] the
> period of time which elapsed before the parent sought to reclaim the child,
> [5] the nature and strength of the ties between the child and the third party
> custodian, [6] the intensity and genuineness of the parent's desire to have the
> child, [7] the stability and certainty as to the child's future in the custody of
> the parent. . . . The need to find "exceptional circumstances" is derived from
> the belief that extreme care must be exercised in determining a custody
> placement other than with a fit parent.

(Brackets in original) (cleaned up); see also In re Adoption/Guardianship of H.W., 460 Md.

201, 216, 189 A.3d 284, 292 (2018) (We reiterated that the factors set forth above were to

be used in a case to determine "whether exceptional circumstances were present in a

custody dispute between a parent and a third party[.]"). With respect to the first factor, in

Burak, 455 Md. at 663, 168 A.3d at 941, we explained that the purpose of the factor "is to

determine whether the child [] has been outside the care and control of the biological parent

for a sufficient period of time for a court to conclude that the constructive physical custody

of the child has shifted from the biological parent to a third-party[,]" i.e., "whether a

biological parent has, in effect, abandoned his or her child." In McDermott, 385 Md. at

325-26, 869 A.2d at 754, we held that, in the absence of a finding of parental unfitness,

"the requirements of a parent's employment, such that he is required to be away at sea, or

- 26 -

otherwise appropriately absent from the State for a period of time, and for which time he or she made appropriate arrangements for the care of the child, do not constitute" exceptional circumstances to support an award of custody to a third party.

## *De Facto* **Parenthood in Maryland**

As explained above, a *de facto* parent is "a party who claims custody or visitation rights based upon the party's relationship, in fact, with a non-biological, non-adopted child." Conover, 450 Md. at 62, 146 A.3d at 439 (cleaned up). In other words, a *de facto* parent is a person other than a child's legal, *i.e.*, biological or adoptive, parent who has a parent-like relationship with the child. See id. at 62, 146 A.3d at 439. In Conover, 450 Md. at 62 n.6, 146 A.3d at 439 n.6, we noted that the American Law Institute ("ALI") defines a *de facto* parent as follows:

> [A]n individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
>
> > (i) lived with the child and,
>
> > (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,
>
> > > (A) regularly performed a majority of the caretaking functions for the child, or
>
> > > (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

(Quoting American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(1)(c) (2003) (adopted May 16, 2000)).

In Conover, id. at 85, 74, 146 A.3d at 453, 446-47, this Court recognized *de facto*

- 27 -

parenthood and adopted the following four-part test from H.S.H.-K., 533 N.W.2d at 435-36, for determining whether a person is a *de facto* parent:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

Because Conover is the primary case in Maryland concerning *de facto* parenthood, we will spend some time discussing the case. In Conover, 450 Md. at 55, 146 A.3d at 435, a same-sex couple, Michelle[12] and Brittany, entered into a relationship in July 2002. The two discussed having a child and agreed that Brittany would be artificially inseminated from an anonymous donor, and in April 2010, Brittany gave birth to a son. See id. at 55, 146 A.3d at 435. The child's birth certificate identified Brittany as the mother, but no one was identified as the father. See id. at 55, 146 A.3d at 435. Six months later, in September 2010, Michelle and Brittany married. See id. at 55, 146 A.3d at 435. A year later, in

---

[12]In Conover, 450 Md. at 55 n.1, 146 A.3d at 435 n.1, on brief in this Court, Michelle advised that "she is now a 'transgender man' and state[d] that the record d[id] not reflect her gender identity because she transitioned to living as a man after the contested divorce hearing occurred." Michelle advised that for consistency she would refer to herself using female pronouns. See id. at 55 n.1, 146 A.3d at 435 n.1. As such, this Court also referred "to Michelle using female pronouns and her former name." Id. at 55 n.1, 146 A.3d at 435 n.1.

September 2011, Michelle and Brittany separated. See id. at 55, 146 A.3d at 435. From September 2011 to July 2012, Michelle visited the child and had overnight and weekend access. See id. at 55, 146 A.3d at 435. In July 2012, Brittany stopped allowing Michelle to visit with the child. See id. at 55, 146 A.3d at 435.

In February 2013, Brittany filed a complaint for absolute divorce, and Michelle filed an answer requesting visitation rights with the child. See id. at 55, 146 A.3d at 435. The following month, Michelle filed a counter-complaint for absolute divorce, again requesting visitation. See id. at 55, 146 A.3d at 435. Following an evidentiary hearing on Michelle's request for visitation, the trial court issued a written opinion concluding that Michelle did not have standing to seek custody or visitation. See id. at 55-56, 146 A.3d at 435-36. Although the trial court determined that Michelle was the child's *de facto* parent, it stated that, in Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008), the Court had concluded that *de facto* parenthood is not recognized in Maryland. See Conover, 450 Md. at 58, 146 A.3d at 437. As such, the trial court ruled that Michelle did not have third party standing to contest custody or visitation absent a showing of parental unfitness or exceptional circumstances, which Michelle had not demonstrated. See id. at 58, 146 A.3d at 437. After the divorce was granted, Michelle appealed the trial court's order as to visitation and the Court of Special Appeals affirmed. See id. at 58, 146 A.3d at 437.

On *certiorari*, this Court overturned Janice M. as clearly wrong and contrary to established principles and as being superseded by significant changes in the law or facts and we recognized *de facto* parent status in Maryland, holding "that *de facto* parenthood is a viable means to establish standing to contest custody or visitation[.]" Conover, 450 Md.

at 66, 59, 146 A.3d at 442, 437. We observed that, before <u>Janice M.</u>, in <u>S.F. v. M.D.</u>, 132 Md. App. 99, 751 A.2d 9 (2000), the Court of Special Appeals had treated *de facto* parent status as sufficient to confer standing to seek visitation and had adopted the four-factor test set forth in <u>H.S.H.-K.</u> for determining whether a person is a *de facto* parent. See <u>Conover</u>, 450 Md. at 61, 146 A.3d at 439. Stated otherwise, in <u>Conover</u>, <u>id.</u> at 66, 146 A.3d at 442, the Court determined that grounds for an exception to the principle of *stare decisis*[13] existed and overruled <u>Janice M.</u> We pointed out that the cases relied on in <u>Janice M.</u>—primarily <u>McDermott</u> and <u>Koshko</u>—involved the rights of third parties, not those of people claiming *de facto* parent status. See <u>Conover</u>, <u>id.</u> at 67, 146 A.3d at 442. We concluded that "neither *McDermott* nor *Koshko* justified this Court's decision in *Janice M.* What the Court failed to identify was any rationale for eliminating consideration of the parent-like relationship that the plaintiff sought to protect. It seemingly ignored the bond that the child develops with a *de facto* parent." <u>Conover</u>, <u>id.</u> at 69, 146 A.3d at 443. Moreover, we stated that <u>Janice M.</u> erred in its interpretation of the Supreme Court's "narrow" decision in <u>Troxel</u> to reason that "*Troxel* undermined *S.F.* and the recognition of *de facto* parenthood."[14]

---

[13]"Under the doctrine of *stare decisis*, generally, a court must follow earlier judicial decisions when the same points arise again in litigation." <u>Sabisch v. Moyer</u>, 466 Md. 327, 372 n. 11, 220 A.3d 272, 298 n.11 (2019) (cleaned up). We have explained, however, that *stare decisis* "is not absolute. Under [] two exceptions to *stare decisis*, an appellate court may overrule a case that either was clearly wrong and contrary to established principles, or has been superseded by significant changes in the law or facts." <u>Id.</u> at 372 n.11, 220 A.3d at 298 n.11 (cleaned up).

[14]In <u>Troxel</u>, 530 U.S. at 61, grandparents of two minor children petitioned to obtain visitation rights pursuant to a state visitation statute, which provided that "[a]ny person may petition the court for visitation rights at any time, including, but not limited to, custody proceedings. The Court may order visitation rights for any person when visitation may

Conover, id. at 69-70, 73, 146 A.3d at 443-44, 446.

We determined that, prior to Janice M., the recognition of *de facto* parenthood in S.F. was, in actuality, "consistent with *McDermott*, *Koshko*, and *Troxel* because the [H.S.H.-K.] test [S.F.] used to determine *de facto* parenthood was narrowly tailored to avoid infringing upon the parental autonomy of a legal parent." Conover, 450 Md. at 73-74, 146 A.3d at 446. This Court expressly adopted the four-factor test first set forth in H.S.H.-K., stating that "[u]nder this strict test, a concern that recognition of *de facto* parenthood would interfere with the relationship between legal parents and their children is largely eliminated." Conover, 450 Md. at 75, 146 A.3d at 447. The Court explained that *de facto* parenthood "does not contravene the principle that legal parents have a fundamental right to direct and govern the care, custody, and control of their children because a legal parent does not have a right to voluntarily cultivate their child's parental-type relationship with a third party and then seek to extinguish it." Id. at 75, 146 A.3d at 447.

In addition to identifying the weak grounds on which the decision in Janice M.

serve the best interest of the child whether or not there has been any change of circumstances." (Cleaned up). A four-justice plurality held that the state visitation statute was unconstitutional as applied and that the state trial court's visitation order in favor of the grandparents unconstitutionally infringed on the parent's "fundamental right to make decisions concerning the care, custody, and control" of her children pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Troxel, 530 U.S. at 72-73. As we explained in Conover, 450 Md. at 70, 146 A.3d at 444, the Supreme Court's holding in Troxel was "extremely narrow" and the plurality in Troxel "expressly declined to address whether substantive due process requires a showing of harm before non-parental visitation is ordered and asserted that 'we do not, and need not, define today the precise scope of the parental due process right in the visitation context.'" (Quoting Troxel, 530 U.S. at 73).

rested, we concluded that <u>Janice M.</u> had been undermined by subsequent events, primarily Maryland's recognition of same-sex marriage in 2012, which demonstrated greater acceptance of different types of family units in society. <u>See</u> <u>Conover</u>, <u>id.</u> at 77, 146 A.3d at 448 (citations omitted). Moreover, at the time of the Court's holding in <u>Conover</u>, "a majority of states, either by judicial decision or statute, [] recognize[d] *de facto* parent status or a similar concept." <u>Id.</u> at 78, 146 A.3d at 449 (citations omitted). We observed that "family law scholarship and the academic literature [] also endorsed the notion that a functional relationship—as well as biology or legal status—can be used to define parenthood." <u>Id.</u> at 81, 146 A.3d at 451. We noted that the ALI had "recommended expanding the definition of parenthood to include *de facto* parents and includes a *de facto* parent as one of the parties with standing to bring an action for the determination of custody, subject to the best interests of the child analysis." <u>Id.</u> at 81, 146 A.3d at 451 (citation omitted). We determined that <u>Janice M.</u> "sharply" deviated from the law in other jurisdictions, which reinforced "our decision to overturn *Janice M.* and recognize *de facto* parenthood" in Maryland. <u>Conover</u>, 450 Md. at 82, 146 A.3d at 451.

We explained that, "[i]n light of our differentiation in *McDermott*, 385 Md. at 356, 869 A.2d 751, between 'pure third parties' and those persons who are in a parental role, we now make explicit that *de facto* parents are distinct from other third parties." <u>Conover</u>, 450 Md. at 85, 146 A.3d at 453. We held that a *de facto* parent has "standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interests of the child analysis." <u>Id.</u> at 85, 146 A.3d at 453. As such, we reversed the judgment of the Court of Special Appeals and directed that

Court to remand the case to the trial court for a "determination of whether, applying the *H.S.H.-K.* standards, Michelle should be considered a *de facto* parent[.]" Id. at 85, 146 A.3d at 453.

As explained above, in Conover there were two concurring opinions. One concurring opinion agreed with the recognition of *de facto* parenthood in Maryland, but expressed concern that, in adopting the four-factor H.S.H.-K. test, the Majority adopted "a standard that [was] too broad and that could have a negative impact on children in Maryland[,]" in large part because *de facto* parenthood could be established with the consent of only one legal parent. Conover, id. at 87, 146 A.3d at 454 (Watts, J., concurring). The concurring opinion pointed out that in holding that when seeking *de facto* parent status, a third party must show that the biological or adoptive parent consented to and fostered the third party's formation and establishment of a parent-like relationship with a child, the Majority apparently held "that only one parent [was] needed to consent to and foster a parent-like relationship with the would-be *de facto* parent." Id. at 87-88, 146 A.3d at 454-55 (Watts, J., concurring). The concurring opinion explained that the first factor of the H.S.H.-K. test, as framed by the Majority, would "work" where there is only one existing legal parent, but observed that where there are two existing parents, "permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created." Id. at 88, 146 A.3d at 455 (Watts, J., concurring). Such circumstances not only ignored the reality of family life, but also could "result in a child having three parents vying for custody and visitation, and being overburdened by the demands of multiple parents." Id. at 88, 146

A.3d at 455 (Watts, J., concurring).

The concurring opinion expressed concern that, where there are two existing parents, children would "not be served well by the creation of a test that does not account for the second parent's knowledge and consent." Id. at 88, 146 A.3d at 455 (Watts, J., concurring).[15] The concurring opinion offered the following guidance for the circumstance where a child has two existing parents:

> In every instance in which a trial court is confronted with a request for *de facto* parentship, the trial court should ascertain whether there are one or two existing biological or adoptive parents. In the case of two existing parents, the trial court should require that the second parent have notice of the *de facto* parent request and ascertain whether the second parent consents to the *de facto* parent relationship. In satisfaction of the first prong of the H.S.H.-K. test, an action for *de facto* parenthood may be initiated only by an existing parent or a would-be *de facto* parent by the filing of a verified complaint attesting to the consent of the establishment of *de facto* parent status. The trial court should find by clear and convincing evidence that the parent has established: [] that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child, and in the event of two existing biological or adoptive parents, that both parents consented to the establishment of a *de facto* parentship[.]

Id. at 93, 146 A.3d at 458 (cleaned up) (Watts, J., concurring). The concurring opinion stated that, although the holding of the majority opinion was appropriate for the parties in the case, adoption of the four-factor H.S.H.-K. test, "with no additional safeguards or limitations" resulted in a "fail[ure] to provide important safeguards as to how *de facto* parentships are to be created and fail[ed] to serve all litigants, including those similarly

---

[15]The concurring opinion observed that even creating a standby guardianship in Maryland has traditionally required the consent of both parents. See Conover, 450 Md. at 89, 146 A.3d at 455 (Watts, J., concurring).

- 34 -

situated to the parties in th[e] case as well as others who do not live in a classic nuclear family." Id. at 94, 146 A.3d at 458 (Watts, J., concurring). In Conover, 450 Md. at 75 n.18, 146 A.3d at 447 n.18, in a footnote, the majority commented on the potential recognition of successive *de facto* parents and stated that "[i]n deciding whether to award visitation or custody to a *de facto* parent, the equity court should also take into account whether there are other persons who have already been judicially recognized as *de facto* parents. A court should be very cautious and avoid having a child or family to be overburdened or fractured by multiple persons seeking access." Despite addressing the concern of multiple *de facto* parents, however, the majority did not comment on the issue raised in the concurrence regarding the need for the consent of both parents where there are two legal parents.

In a second concurring opinion, the Honorable Clayton Greene, Jr. also agreed with the recognition of *de facto* parent status in Maryland and the adoption and application of the H.S.H.-K. four-factor test, but disagreed "that a person who qualifies as a *de facto* parent is not required, *per se*, to establish exceptional circumstances." Conover, 450 Md. at 86, 146 A.3d at 453-54 (Greene, J., concurring). Judge Greene would have required Michelle "to demonstrate exceptional circumstances to justify the need for a best interest analysis" and would have concluded that *de facto* parenthood "is a relevant factor but [] not the only factor for the court to consider in reaching [an] ultimate decision to grant child access." Id. at 86, 146 A.3d at 454 (Greene, J., concurring).

Two years after Conover, in Kpetigo v. Kpetigo, 238 Md. App. 561, 565, 192 A.3d 929, 932 (2018), the Court of Special Appeals rejected a father's argument that Conover

recognized *de facto* parenthood only for same-sex married couples and affirmed a trial court's finding that the father's ex-wife was a *de facto* parent to F, the father's son from a prior relationship. The father and the ex-wife had parented two boys—L, their biological child, who was born during the couples' marriage, and F, the father's son from a previous relationship with a woman who was a resident of the Ivory Coast. See id. at 565-66, 192 A.3d at 932. From the time he was four months old, F, who was born in France, visited the father in the United States, with both the father and ex-wife caring for him. See id. at 566, 192 A.3d at 932. When F was three years old, the father and ex-wife married; at that time, F lived mostly full time with the couple. See id. at 566, 192 A.3d at 932. After the father and ex-wife married, she expressed interest in adopting F, but the father was reluctant to disrupt the relationship between F and his biological mother. See id. at 566, 192 A.3d at 932. The ex-wife nevertheless cared for F as if he were her child and was involved in all aspects of his life. See id. at 566, 192 A.3d at 932. In 2014, F was abducted by his mother while visiting her in Africa, and the father and ex-wife worked to regain custody. See id. at 566, 192 A.3d at 932. After F was returned, the father gained full physical and legal custody of F. See id. at 566, 192 A.3d at 932. Aside from F's mother visiting once in 2015, her communication with F thereafter was through calls and video chats as a warrant had been issued for her arrest in the United States. See id. at 567, 192 A.3d at 933.

In December 2015, the father and ex-wife separated. See id. at 567, 192 A.3d at 933. Until that time, F had resided full time with the couple and after the separation both F and L initially lived with the ex-wife until F eventually moved to live with the father.

See id. at 567, 192 A.3d at 933. The ex-wife continued to visit F until the father restricted visitation. See id. at 567, 192 A.3d at 933. Eventually, the ex-wife filed for a limited divorce and, among other things, sought visitation with F. See id. at 567-68, 192 A.3d at 933. Following a trial, the trial court issued an order finding, in pertinent part, that the ex-wife qualified as a *de facto* parent of F under the four-factor test adopted in Conover, that it was in F's best interest to maintain his relationship with the ex-wife, and that the ex-wife was entitled to visitation with F. See Kpetigo, 238 Md. App. at 568, 192 A.3d at 933. Apparently, F's mother was named as a party, but never appeared and did not participate. See id. at 565, 192 A.3d at 932. The father appealed. See id. at 568, 192 A.3d at 933.

On appeal, the Court of Special Appeals concluded that "nothing in *Conover* suggest[ed] that *de facto* parenthood is available only to same-sex couples." Id. at 574, 192 A.3d at 937. The Court of Special Appeals explained that "*Conover*'s *de facto* parenthood test measures the relationship between the putative *de facto* parent and the child—a relationship formed with the biological parent's knowledge and consent—without reference to the parent's characteristics or the relationship's origins." Id. at 574, 192 A.3d at 937. The Court of Special Appeals determined that the trial court properly applied Conover and observed that, at trial, the father had stipulated that the ex-wife satisfied the first two factors of the four-factor test—that the father had consented to the ex-wife's parent-like relationship with F and that the ex-wife and F had lived together in the same household. See id. at 575-76, 192 A.3d at 938. The Court of Special Appeals concluded that the trial court properly ruled that the ex-wife met the burden of satisfying the third and fourth factors for establishing *de facto* parenthood—she had assumed the obligations of

parenthood and had a parent-child bond with F. See id. at 576, 192 A.3d at 938. Although there were two known biological parents, the case did not concern the issue of whether in order to satisfy the first factor both parents were required to have consented to the fostering of a *de facto* parent relationship.

**Forms of Consent in Maryland**

The relevant concepts of consent generally fall into two categories—express consent and implied consent. "Express consent," otherwise known as "affirmative consent," is "[c]onsent that is clearly and unmistakably stated[,]" whereas "implied consent" is "[c]onsent inferred from one's conduct rather than from one's direct expression." *Express Consent*, Black's Law Dictionary (11th ed. 2019); *Implied Consent*, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary provides as a second definition of "implied consent" that it is "[c]onsent imputed as a result of circumstances that arise, as when a surgeon removing a gall bladder discovers and removes colon cancer." *Implied Consent*, Black's Law Dictionary (11th ed. 2019). More basically, "consent" means "to give assent or approval[,]" "compliance in or approval of what is done or proposed by another[,]" or "agreement as to action or opinion." *Consent*, Merriam-Webster.com Dictionary, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/consent [https://perma.cc/EA9H-D788]. And "imply" means "to express indirectly[,]" "to involve or indicate by inference, association, or necessary consequence[,]" or "to recognize as existing by inference or necessary consequence especially on legal or equitable grounds[.]" *Imply*, Merriam-Webster.com Dictionary, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/implied

- 38 -

[https://perma.cc/9RWQ-A9A7].

By way of background, as to implied consent, the concept is used in several areas, such as in torts, as a defense to a claim of trespass, and in Fourth Amendment search and seizure cases. In the context of a claim of trespass—"a tort involving an intentional or negligent intrusion upon or to the possessory interest in property of another"—the Court of Special Appeals explained that one element of such a claim is that the plaintiff must establish nonconsensual interference with a possessory interest in the plaintiff's property. Mitchell v. Balt. Sun Co., 164 Md. App. 497, 508, 883 A.2d 1008, 1014 (2005), cert. denied, 390 Md. 501, 889 A.2d 418 (2006) (cleaned up). Such interference must be without the plaintiff's consent and "consent, either expressed or implied, constitutes a complete defense, so long as the scope of that consent is not exceeded." Id. at 508, 883 A.2d at 1014-15 (citation omitted). In Mitchell, id. at 510-11, 883 A.2d at 1016, the Court discussed the concept of implied consent through custom and stated that "[c]onsent is willingness in fact for conduct to occur" which "may be manifested by action or inaction and need not be communicated to the actor." (Cleaned up). The Court of Special Appeals explained that "[i]f words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact." Id. at 511, 883 A.2d at 1016 (cleaned up). The Court also observed:

> In determining whether conduct would be understood by a reasonable person as indicating consent, the customs of the community are to be taken into account. This is true particularly of silence or inaction. Thus if it is the custom in wooded or rural areas to permit the public to go hunting on private land or to fish in private lakes or streams, anyone who goes hunting or fishing may reasonably assume, in the absence of a posted notice or other manifestation to the contrary, that there is the customary consent to his entry

upon private land to hunt or fish.

Id. at 511, 883 A.2d at 1016 (cleaned up). In the same case, the Court discussed implied consent through acquiescence—specifically, the argument that, because an occupant of a room at a private nursing home answered questions from reporters who were alleged to be intruding, he impliedly consented to their presence. See id. at 513, 883 A.2d at 1017. The Court reiterated that to constitute implied or apparent consent, the words or conduct at issue "must be reasonably understood by another to be intended as consent[,]" and determined that a reasonable trier of fact could have concluded that the reporters could not have reasonably believed that the occupant voluntarily responded to their questions or consented to their presence in his room. Id. at 516, 883 A.2d at 1019. As such, the Court determined that there was a dispute of material fact as to whether the occupant consented to the interview. See id. at 517, 883 A.2d at 1019.

In addition, the Court concluded that, viewing the facts in the light most favorable to the occupant, it was not persuaded that a nurse had either expressly or impliedly consented to the reporter's presence in the room. The Court stated that it was not persuaded that the nurse's "silence and thankful farewell could reasonably be construed to constitute implied consent in the face of the [occupant]'s explicit directions for the reporters to leave his room." Id. at 517, 883 A.2d at 1020.

In the criminal law context, the Fourth Amendment prohibits warrantless searches and seizures, but it is well established that consent to a search or seizure is a recognized exception to warrant requirement. See Jones v. State, 407 Md. 33, 51, 962 A.2d 393, 402-03 (2008). This Court has stated that "[a] search conducted pursuant to valid consent, *i.e.*,

voluntary and with actual or apparent authority to do so, is a recognized exception to the warrant requirement." Id. at 51, 962 A.2d at 403 (cleaned up). Where the State alleges that consent to a search or seizure was given, the State must prove that such "consent was freely and voluntarily given[,]" which "is a question of fact, to be decided based upon a consideration of the totality of the circumstances." Id. at 51-52, 962 A.2d at 403 (cleaned up). Consent to search "may be express, by words, but also may be implied, by conduct or gesture." Turner v. State, 133 Md. App. 192, 207, 754 A.2d 1074, 1082 (2000) (citation omitted). In Turner, id. at 207-08, 754 A.2d at 1082-83, the Court of Special Appeals elaborated that, in cases where consent was determined to have been given,

> the police made it known, either expressly or impliedly, that they wished to enter the defendant's house, or to conduct a search, and within that context, the conduct from which consent was inferred gained meaning as an unambiguous gesture of invitation or cooperation or as an affirmative act to make the premises accessible for entry. By contrast, in those Fourth Circuit cases in which the court concluded that the facts could not support a finding of implied consent, the law enforcement officers either did not ask for permission to enter or search, and thus did not make known their objective, or, if they did, their request was met with no response or one that was nonspecific and ambiguous.

Finally, we observe that, in the context of federal bankruptcy law, in Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 669, 683 (2015), the Supreme Court held that Article III of the Constitution of the United States "is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge" of Stern claims.[16] Typically,

---

[16]In Wellness, 575 U.S. at 673, the Supreme Court explained that, in Stern v. Marshall, 564 U.S. 462 (2011), it "held that Article III prevents bankruptcy courts from entering final judgment on claims that seek only to augment the bankruptcy estate and would otherwise exist without regard to any bankruptcy proceeding." (Cleaned up).

Stern claims would be adjudicated by a judge of an Article III court, but the Supreme Court concluded that bankruptcy litigants may waive the right to Article III adjudication of Stern claims. See Wellness, 575 U.S. at 679. The Supreme Court concluded that "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express" and that nothing in the relevant statute requires express consent either. The Supreme Court stated that the relevant statute requires only that a bankruptcy court obtain the consent "of all parties to a proceeding before hearing and determining a non-core claim." Id. at 684 (cleaned up). The Supreme Court also discussed a prior case, Roell v. Withrow, 538 U.S. 580 (2003), concerning interpretation of a different statute, "which authorizes magistrate judges to conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, with the consent of the parties[,]" and in which the Court held that the consent need not be express as "the Article III right is substantially honored by permitting waiver based on actions rather than words." Wellness, 575 U.S. at 684 (cleaned up). The Supreme Court determined that the implied consent standard set forth in in Roell provided "the appropriate rule for adjudications by bankruptcy courts[.]" Id. The Supreme Court emphasized, though, "that a litigant's consent—whether express or implied—must still be knowing and voluntary." Id. at 685. To that end, according to the Supreme Court "the key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." Id. (cleaned up).

### Relevant *De Facto* Parenthood Case Law from Other Jurisdictions

Intermediate appellate courts in New Jersey and Washington, states that have or had

adopted the four-factor test from <u>H.S.H.-K.</u> for establishment of *de facto* parenthood,[17] have considered whether the first factor requires the consent of both legal parents where there are two existing parents and have reached different results. Prior to the legislature in Washington enacting a statute,[18] in <u>In re Parentage of J.B.R.</u>, 336 P.3d 648, 649-50 (Wash. Ct. App. 2014), the Court of Appeals of Washington considered whether *de facto* parenthood could extend to a stepparent of a child who had two legal parents and held that *de facto* parenthood "may be so extended if the stepparent petitioner establishes the

---

[17]<u>See</u> <u>V.C. v. M.J.B.</u>, 748 A.2d 539, 551-53 (N.J.), <u>cert. denied</u>, 531 U.S. 926 (2000); <u>In re Parentage of L.B.</u>, 122 P.3d 161, 176-77 (Wash. 2005) (*en banc*), <u>cert. denied</u> <u>sub. nom.</u> <u>Britain v. Carvin</u>, 547 U.S. 1143 (2006).

[18]<u>See</u> Wash. Rev. Code Ann. § 26.26A.440(4) (2019). Among other factors, the statute provides that an individual who claims to be a *de facto* parent of a child must demonstrate by a preponderance of the evidence that "[a]nother parent of the child fostered or supported the bonded and dependent relationship required under (e) of this subsection[.]" <u>Id.</u> at § 26.26A.440(4)(f). In a recent case in which the Court of Appeals of Washington addressed several issues under the new statute including whether a stepparent had alleged sufficient facts in a *de facto* parentage petition, the Court commented that the only requirement under Wash. Rev. Code Ann. § 26.26A.440(4)(f) is "that one parent – 'another parent' – support the petitioner's relationship with the child." <u>Matter of L.J.M.</u>, 476 P.3d 636, 644 (Wash. Ct. App. 2020) (cleaned up). In a footnote, the Court observed that "[t]he court in *J.B.R.* analyzed under the common law whether both biological parents fostered and supported the petitioner's relationship with the child. But [Wash. Rev. Code Ann. §] 26.26A.440(4)(f) clearly refers to 'another parent,' not both parents." <u>Id.</u> at 644 n.4 (cleaned up). In <u>L.J.M.</u>, <u>id.</u> at 645, the Court remanded the stepparent's *de facto* parentage petition for a full adjudication. The Court concluded "that whether one parent's support of the petitioner's relationship with the child comes at the expense of the other genetic parent is not relevant to the 'parental support' requirement under [Wash. Rev. Code Ann. §] 26.26A.440(4)(f). The trial court erred in suggesting otherwise." <u>L.J.M.</u>, 476 P.3d at 645; <u>see also</u> <u>Matter of Custody of SA-M</u>, ___ P.3d ___, 2021 WL 2431598, *5 (Wash. Ct. App. June 15, 2021). Despite subsequent changes in Washington law establishing a different test, in <u>J.B.R.</u>, the Court of Appeals of Washington necessarily interpreted the four factors of the <u>H.S.H.-K.</u> test for establishment of *de facto* parenthood, the same factors that were adopted by this Court in <u>Conover</u> and that are before us in this case.

relevant four factors, which include establishing that *both* legal parents consented to the stepparent being a parent to the child." (Emphasis in original). In that case, J.B.R. was born to Lacey Shows-Re and James Candler, who ended their relationship when J.B.R. was an infant. See id. at 650. When J.B.R. was about two years old, Candler stopped visiting her and then had no contact with his daughter for over the next ten years. See id. Also, when J.B.R. was about two years old, Shows-Re entered into a relationship with Nathanial York, who treated J.B.R. as his own child. See id. J.B.R. referred to York as her father and Shows-Re encouraged the relationship between the two. See id. Shows-Re and York had a child, N.A.Y., while together. See id. Four years after beginning their relationship, Shows-Re and York ended it. See id. York sporadically visited N.A.Y. and J.B.R. for about two years, but then visitation became more regular. See id. Four years later, a regular visitation schedule was set with N.A.Y. and Shows-Re allowed J.B.R. to accompany N.A.Y. on most of the visits. See id.

After a disagreement about visitation, York filed a petition to establish himself as a *de facto* parent of J.B.R., who was eleven years old at the time. See id. The trial court entered a temporary parenting plan for J.B.R. and the following month Candler responded to the *de facto* parent petition and filed a counterclaim for visitation. See id. The trial court appointed a guardian ad litem (GAL) to investigate whether J.B.R. would benefit from continuing the parent-child relationship with York, who recommended that York be declared J.B.R.'s *de facto* parent given the close relationship between the two. See id. Among other things, the GAL found that York had a ten-year relationship with J.B.R. and that Candler had no contact with J.B.R. until the *de facto* parent petition was filed. See id.

Shows-Re moved to dismiss the *de facto* parent petition and the trial court denied the motion. See id. at 650-51. The trial court specifically "found that J.B.R. did not have two existing, fit parents in her life at the time that [] York was introduced into [her] life." Id. at 651. The trial court concluded that York had "made a prima facie showing of de facto parentage to defeat [] Shows-Re's motion" and Shows-Re appealed. Id.

On appeal, Shows-Re contended that *de facto* parenthood "is available only when a child does not have two legal parents whose roles are already established under [Washington's] statutory scheme" and that, because J.B.R. has two biological parents, York and the trial court could not "carve out a space for a third parent without eroding the rights of the other two." Id. at 653. The Court of Appeals rejected that argument, determining based on Washington case law that "[t]he fact that J.B.R. has two living biological parents does not prohibit [] York from petitioning for de facto parentage." Id. The Court observed that, in a prior case, the Supreme Court of Washington had concluded that "[t]he long-absent biological father's emergence into [the child]'s life at the time of the petition did not prohibit application of the" *de facto* parent doctrine. Id.

The Court turned to the four factors for establishment of *de facto* parenthood and concluded that York had clearly set forth a *prima facie* case for the second, third, and fourth factors. See id. As to the first factor—whether "the natural or legal parent consented to and fostered the parent-like relationship"— the Court stated that it was undisputed that Shows-Re consented to and fostered the formation of a parent-child relationship between York and J.B.R. Id. The Court determined that York entered J.B.R.'s life while she was young and filled a role left vacant by her absent biological father, Candler. Id. The Court

- 45 -

stated that Candler's choice to not support J.B.R. or even to seek to have a relationship with her for over a decade demonstrated "his consent for [] York to establish a parent-child relationship with J.B.R." Id. The Court observed that Candler's complete non-involvement in J.B.R.'s life for over a decade "fostered th[e] relationship, as J.B.R. did not have an alternative person acting as a father figure." Id. The Court stated: "If [] York undertook an unequivocal and permanent parental role with the consent of all existing parents but does not have a statutorily protected relationship, justice prompts us to apply the de facto parent test. This adequately balances the rights of biological parents, children, and other parties." Id. (cleaned up).

By contrast, in K.A.F. v. D.L.M., 96 A.3d 975, 983 (N.J. Super. Ct. App. Div. 2014), the Appellate Division of the Superior Court of New Jersey concluded that the first factor of the H.S.H.-K. test requires the consent of only one legal custodial parent. In that case, K.A.F. and F.D. entered into a relationship and a few years later, a child, Arthur, was conceived by K.A.F. through artificial insemination. See id. at 977. F.D. adopted Arthur. See id. Later, K.A.F. and F.D. ended their relationship and K.A.F. entered into a relationship with D.M.,[19] a mutual friend of K.A.F. and F.D. See id. at 977-78. K.A.F. apparently consented to and fostered the formation of a parent-like relationship between D.M. and Arthur, although F.D. opposed the relationship at all times. See id. at 978. K.A.F. and D.M. eventually ended their relationship and D.M. sought custody of and visitation with Arthur. See id. Both K.A.F. and F.D., the legal parents, opposed custody

---

[19]In K.A.F., 96 A.3d at 977, the Appellate Division of the Superior Court of New Jersey referred to D.L.M. as "D.M."

and visitation by D.M.  See id.  The trial court dismissed D.M.'s claim based on F.D.'s opposition to the parent-like relationship between D.M. and Arthur, ruling that "where there are two fit and involved parents, both must have consented to the creation of a psychological parent relationship before a third party can maintain an action for visitation and custody based on the existence of that relationship."  Id.

The intermediate appellate court disagreed, determining that it "fail[ed] to perceive any basis for th[e] argument either in the law or the policies underlying the concept of a psychological parent."  Id. at 979.  The Court explained that, where a third party seeks custody, a trial court must conduct a two-step analysis—first, to determine whether the presumption in favor of the legal parent is overcome by either a showing of unfitness or exceptional circumstances and then two, if the presumption has been rebutted, to determine whether awarding custody or other relief to the third party would promote the best interests of the child.  See id. at 981.  The Court indicated that psychological parent cases (*i.e.*, *de facto* parent cases) are "a subset of 'exceptional circumstances' cases."  Id. at 980 (cleaned up).  The Court stated that "it would be difficult to ignore the 'psychological harm' a child might suffer because he is deprived of the care of a psychological parent simply because only one of his 'legal parents' consented to the relationship."  Id. at 981.

The Court explained that the clear policy underlying cases from the Supreme Court of New Jersey "is that 'exceptional circumstances' may require recognition of custodial or visitation rights of a third party with respect to a child where the third party has performed parental duties at home for the child, with the consent of a legal parent, however expressed, for such a length of time that a parent-child bond has developed, and terminating that bond

may cause serious psychological harm to the child." Id. at 981-82 (cleaned up). The Court stated that it was "fatuous to suggest that this fundamental policy may be subverted, and that a court may not even examine the issue at a plenary hearing, where one of the child's legal parents colorably claims lack of consent, in circumstances where the other legal parent has consented." Id. at 982.

The Court also found significant the wording of the first factor of the test as well as the Supreme Court of New Jersey's discussion of the test, stating:

> The Court's continual reference to "a" legal parent or "the" legal parent in the singular strengthens our conclusion that the consent of both legal parents is not required to create a psychological parent relationship between their child and a third party.
>
> Nothing in the historical development of the psychological parent policy, in the policy itself, or in the language of the Court, therefore, suggests that both legal parents must consent before a court may consider a claim of psychological parenthood by a third party. Rather, it is sufficient if only one of the legal custodial parents has consented to the parental role of the third party. In that circumstance, a legal custodial parent has voluntarily created the relationship and thus has permitted the third party to enter the zone of privacy between her and her child.

K.A.F., 96 A.3d at 982-83.

The Court nonetheless stated that, in so holding, it was "not discount[ing] the importance of F.D.'s 'consent', or lack thereof[.]" Id. at 983. Referring to F.D.'s consent, the Court stated that "[i]t may be used by a trial court, in an appropriate context, as one factor among many in determining whether a third party has established that he or she is a psychological parent of a child, and, if so, whether the best interests of the child warrant some form of custody or visitation." Id. (cleaned up). The Court noted "that in most cases, the longer and more established the parental role of a third party has become, the lack of

- 48 -

consent by one legal parent would diminish in analytical significance." Id.[20]

**Analysis**

After careful review of the matter, we hold that, under the first factor of the H.S.H.-K. test adopted by this Court in Conover for establishment of *de facto* parenthood, where there are two legal (biological or adoptive) parents, a prospective *de facto* parent must demonstrate that both legal parents consented to and fostered such a relationship or that a non-consenting legal parent is unfit or exceptional circumstances exist. In this case, it is clear that, although D.D. may have consented to and fostered T.R.'s formation and establishment of a parent-like relationship with G.D. and B.D., E.N. has not expressly or impliedly consented to and fostered the relationship between her children and T.R. In addition, T.R. did not establish that E.N. was an unfit parent or that exceptional circumstances existed such that T.R. would have standing to seek custody of the children. Although T.R. may have satisfied the second, third, and fourth factors of the H.S.H.-K. test, she failed to satisfy the first factor and the circuit court erred in concluding that T.R. was a *de facto* parent to the children and in granting her joint legal custody and sole physical custody. As such, we reverse the judgment of the Court of Special Appeals, which affirmed the circuit court's judgment.

The issue in this case was not presented in Conover, as in that case, the child had only one legal parent—Brittany, the biological mother. See Conover, 450 Md. at 55, 146

---

[20]Because the trial court had dismissed D.M.'s complaint on a motion for summary judgment, the Court remanded the case for a plenary hearing on whether D.M. was the psychological parent of Arthur and, if so, whether the best interests of Arthur required custody, visitation, or other relief. See K.A.F., 96 A.3d at 985.

A.3d at 435. Nor was the issue presented in Kpetigo, where, although the child had two biological parents and apparently the child's mother never appeared before the trial court or otherwise participated in court proceedings, no issue was raised as to whether the consent and fostering of the ex-wife's (the *de facto* parent's) formation of a parent-like relationship with the child required the consent of both the mother and the father and no review by this Court was sought. See Kpetigo, 238 Md. App. at 566, 192 A.3d at 932. As such, this case presents the first occasion on which this Court must address application of the first factor of the four-factor test adopted in Conover to circumstances where a child has two existing legal parents.

It is well recognized that a parent has a fundamental right, protected by the Fourteenth Amendment of the United States Constitution, to direct and govern the care, custody, and control of the parent's children. See Conover, 450 Md. at 60, 146 A.3d at 438; In re Yve S., 373 Md. at 565, 819 A.2d at 1038. Significantly, there exists a well-established presumption that a child's best interests are served by maintaining parental rights, such that even the Supreme Court has accepted the presumption that parents act in the best interests of their children. See In re Yve S., 373 Md. at 571-72, 819 A.2d at 1042. Put plainly, there is a fundamental constitutional right to parent one's children and a presumption in favor of a parent having the right to raise his or her own children.

In cases not involving *de facto* parents, *i.e.*, cases involving third parties seeking custody or visitation, this Court has repeatedly concluded that to award custody or visitation to the third party, the third party must show that the parents are unfit or that exceptional circumstances exist, before a trial court can apply the best interests of the child

standard. See Conover, 450 Md. at 61, 146 A.3d at 438; Burak, 455 Md. at 624, 168 A.3d at 918. And, in cases where there are two legal parents in a custody dispute, one of the key considerations in awarding or not awarding joint legal custody is whether the parents can communicate and make meaningful decisions together about the child. See, e.g., Santo v. Santo, 448 Md. 620, 628, 630, 141 A.3d 74, 78, 79 (2016) (Although not the dispositive factor, "effective parental communication is weighty in a joint legal custody situation because, under such circumstances, parents are charged with making important decisions together that affect a child's future."). With these principles in mind, we conclude that to declare the existence of a *de facto* parentship based on the consent of only one parent and ignore whether a second legal parent has consented to and fostered the establishment of a parent-like relationship, or is a fit parent or whether exceptional circumstances exist undermines and, essentially, negates that parent's constitutional right to the care, custody, and control of the parent's children. Moreover, completely disregarding whether both legal parents have consented to and fostered a prospective *de facto* parent's parent-like relationship with a child, or that a parent is otherwise unfit or exceptional circumstances exist, not only runs afoul of a parent's constitutional rights, but also basic family law principles.[21]

---

[21]Moreover, in determining whether to award joint custody to two parents, one of the factors a trial court is to consider, in addition to the capacity of the parents to communicate and reach shared decisions affecting the child's welfare, is the fitness of the parents. See Taylor v. Taylor, 306 Md. 290, 304, 308, 508 A.2d 964, 971, 973 (1986). Indeed, we have stated that "[t]he psychological and physical capabilities of both parents must be considered, although the determination may vary depending upon whether a parent is being evaluated for fitness for legal custody or for physical custody. A parent may be

It is without doubt that the best interest of the child standard governs all determinations with respect to children. See, e.g., Conover, 450 Md. at 60, 146 A.3d at 438 ("The primary goal of access determinations in Maryland is to serve the best interests of the child[.]" (Cleaned up)). "[I]n any child custody case, the paramount concern is the best interest of the child." Taylor v. Taylor, 306 Md. 290, 303, 508 A.2d 964, 970 (1986). Indeed, "[t]he best interest of the child is [] not considered as one of many factors, but as the objective to which virtually all other factors speak." Id. at 303, 508 A.2d at 970. With our holding, a determination in keeping with the best interest of the child is ensured by permitting *de facto* parenthood to be established either through the consent of both legal parents or a showing of unfitness or exceptional circumstances. Because exceptional circumstances may be demonstrated even in the presence of two fit legal parents, where the consent of one parent is absent, a trial court will necessarily be in a position to review the facts and circumstances that are unique to each case and make a determination as to a prospective *de facto* parent's standing.

Although Conover rightly recognized *de facto* parenthood in Maryland, the holding in the case is not without its limitations. To the extent that, in Conover, 450 Md. at 85, 146 A.3d at 453, this Court held that parental unfitness or exceptional circumstances were not required to establish *de facto* parenthood before a trial court could apply a best interest of

fit for one type of custody but not the other, or neither, or both." Id. at 308, 508 A.2d at 973. Thus, even where there are two legal parents, let alone a *de facto* parent, before a trial court determines joint or sole custody, the court considers whether one of the parents is unfit. As such, logic dictates that courts should not allow *de facto* parenthood to be created without the consent of both legal parents, a determination of unfitness, or exceptional circumstances.

the child analysis, the holding obviously was rendered against the backdrop of a child with only one legal parent (a biological mother) who would have been required to consent to and foster a relationship with the *de facto* parent. When using the H.S.H.-K. test, where a child has only one legal parent, it is not necessary to find that the existing legal parent is unfit or that exceptional circumstances exist because, if the existing parent's conduct shows that the parent fostered and consented to the formation of the putative *de facto* parent's relationship with the child, nothing more need be shown with respect to the parent. The circumstances are clearly different where a child has two existing legal parents with equal constitutional parental rights.

In light of the fundamental rights at stake and important principles expressed in our case law, we are compelled to hold that, for the well-being of children and family relationships in Maryland, before establishing *de facto* parenthood where there are two existing legal parents, both parents must be shown to have consented to a third party's formation of a parent-like relationship with a child or, in the alternative, that one or both parents are unfit or exceptional circumstances exist. A parent has a fundamental constitutional right to raise and care for the parent's child and where there are two legal parents, one parent's knowing participation in the formation of a third party's *de facto* parent relationship with a child cannot suffice to serve as the consent of the second parent. Endorsing a holding that would permit *de facto* parenthood to be established with the consent of only one parent where there are two legal parents would intrude upon the second parent's constitutional rights, be inconsistent with our case law concerning parental custody (case law holding that third party intervention for custody requires a showing of

unfitness or exceptional circumstances), and would potentially create circumstances that are untenable for all involved.

Before going further, we pause to address one aspect of the Court of Special Appeals's opinion in this case concerning its view of the majority and concurring opinions in Conover. See E.N., 247 Md. App. at 246 & n.10, 236 A.3d at 677 & n.10. In affirming the judgment of the circuit court, the Court of Special Appeals stated:

> We recognize that an interpretation of a majority opinion by a concurring (or dissenting) member of a court is not binding because a majority of the court has not placed its imprimatur on that interpretation. We also recognize that [the] concurring opinion was likely circulated to the entire Court prior to publication. That the Majority did not respond to [the concurring opinion]'s specific and substantive concerns provides us at least some evidence that the Court of Appeals did not disagree with [the concurring opinion's] interpretation of the majority opinion. Indeed, it is not uncommon for the Court of Appeals's majority opinion to respond to issues raised in concurring and dissenting opinions.

Id. at 246, 236 A.3d at 677. It appears that the Court of Special Appeals concluded that, because the majority opinion in Conover did not comment on the concern expressed in the concurring opinion—that where there are two legal parents, the consent of both legal parents should be required—the majority in Conover did not disagree with the concurring opinion's interpretation of its opinion and the majority's silence foreshadowed that a majority of the Court would conclude in this case that only one parent's consent is needed where there are two existing parents.

From our perspective, that a majority opinion of an appellate court may not comment on or respond to a concurring or dissenting opinion may not necessarily be an indication of how a majority of a Court would hold when an issue that is discussed or raised

in a concurring or dissenting opinion is before the Court. There may be any number of instances in which a majority opinion of an appellate court does not comment on a concurring or dissenting opinion. As but one example, on the matter of inconsistent verdicts, in Price v. State, 405 Md. 10, 29, 949 A.2d 619, 630 (2008), this Court overruled prior case law—in which we held that a guilty verdict and a not-guilty verdict could be legally inconsistent where a jury tries the defendant—and held that "inconsistent verdicts shall no longer be allowed." In a concurring opinion, the Honorable Glenn T. Harrell wrote separately "to note explicitly that the Majority's holding applies only to 'legally inconsistent' verdicts, not 'factually inconsistent' verdicts" in criminal cases. Id. at 35, 949 A.2d at 634 (Harrell, J., concurring). In addition, the concurring opinion set forth a procedure to be followed in challenging legally inconsistent verdicts at trial. See id. at 40, 949 A.2d at 637 (Harrell, J., concurring). The majority opinion in Price did not comment on the procedure suggested by the concurring opinion or otherwise clarify or expressly recognize that its holding applied only to legally inconsistent verdicts, not factually inconsistent verdicts, as the concurring opinion stated it did.

Yet, a few years later, in McNeal v. State, 426 Md. 455, 459, 44 A.3d 982, 984 (2012), this Court adopted the view expressed by the concurring opinion in Price, stating: "[W]e adopt as our holding here the thrust of the concurring opinion in *Price*, that jury verdicts which are illogical or factually inconsistent are permitted in criminal trials for reasons we shall explain." The circumstance that the majority opinion in Price did not comment on the view expressed in the concurring opinion was of no moment. The same rationale applies in this case with respect to the majority and concurring opinions in

Conover.  A majority opinion's silence as to the views or concerns expressed in a concurring opinion, or a dissenting opinion for that matter, should not be interpreted as indicative of how the Court would hold when an issue discussed by the concurring or dissenting opinion is later before the Court.

Returning to the matter at hand, although Conover involved only one parent, the rationale underlying our holding in the case supports the conclusion that where there are two legal parents the consent of both parents is necessary to establish *de facto* parenthood. In Conover, 450 Md. at 74, 146 A.3d at 447, this Court recognized that *de facto* parenthood "cannot be achieved without knowing participation by the biological parent."  (Citations omitted).  We observed that, in V.C. v. M.J.B., 748 A.2d 539, 552 (N.J. 2000), the Supreme Court of New Jersey stated that the first factor of the H.S.H.-K. test "is critical because it makes the biological or adoptive parent a participant in the creation of the [*de facto*] parent's relationship with the child."  Conover, 450 Md. at 74, 146 A.3d at 447 (cleaned up).  Additionally, we recognized that, in Marquez v. Caudill, 656 S.E.2d 737, 744 (S.C. 2008), the Supreme Court of South Carolina concluded that the first factor is not only critical because it makes a legal parent a participant in the creation of the *de facto* parent's relationship with the child, but also because it "recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced."  Conover, 450 Md. at 75, 146 A.3d at 447 (cleaned up).

Read to its logical conclusion, to satisfy the first factor, where there are two legal

parents, both parents must knowingly participate in consenting to and fostering the third party's formation of a parent-like relationship with a child. Otherwise, we create the incomprehensible situation in which a *de facto* parentship may be created by the knowing participation of only one legal parent while an equally fit legal parent is denied the same knowing participation in the process and denied the meaningful input that we deemed so critical for a parent to have in creating *de facto* parent status for a third party.

That said, we recognize and hold that a legal parent's actual knowledge of and participation in the formation of a third party's parent-like relationship with a child may occur either through the parent's express or implied consent to and fostering of the relationship. There is no case law or authority that requires that the consent necessary to satisfy the first factor of the *de facto* parent test be express. Rather, we conclude that so long as the consent is knowing and voluntary and would be understood by a reasonable person as indicating consent to the formation of a parent-like relationship between a third party and a child, the first factor of the *de facto* parent test may be satisfied by a legal parent's express or implied consent. As we stated in <u>Conover</u>, 450 Md. at 74, 748 A.2d at 447, *de facto* parenthood requires the knowing participation of the legal parent. Requiring that the necessary consent be knowing and voluntary imposes no greater burden on either legal parent than already exists under the first factor of the *de facto* parent test. Rather, our holding clarifies that the consent of both legal parents is required and that such consent may be express or implied.

A review of the concept of implied consent and its application in Maryland demonstrates that the existence of implied consent is to be determined based on the

circumstances of a particular case and, while such consent may be inferred by a party's conduct, implied consent must nonetheless be knowing and voluntary and must be shown by conduct that would be understood by a reasonable person as indicating consent. See, e.g., Wellness, 575 U.S. at 685; Jones, 407 Md. at 51-52, 962 A.2d at 403; Turner, 133 Md. App. at 207, 754 A.2d at 1082; Mitchell, 164 Md. App. at 510-11, 516, 883 A.2d at 1016, 1019. With respect to *de facto* parenthood, implied consent may be inferred from a legal parent's conduct. Implied consent may be shown through action or inaction, so long as the action or inaction is knowing and voluntary and is reasonably understood to be intended as that parent's consent to and fostering of the third party's formation of a parent-like relationship with the child. Cf. Mitchell, 164 Md. App. at 511, 883 A.2d at 1016. The inaction required to establish implied consent would necessarily involve inaction in the face of information sufficient to inform a legal parent that the other parent had consented to and fostered the formation of a parent-like relationship between a known third party and the legal parent's child, with the legal parent failing to act in any way to object to the formation of such a relationship. In other words, implied consent by inaction would consist of the legal parent having sufficient information concerning the fostering of a parent-like relationship between a third party and the parent's child and the parent knowingly and voluntarily not objecting. As such, an inquiry into whether a legal parent impliedly consented to and fostered a potential *de facto* parent's formation of a parent-like relationship with a child is a fact-specific inquiry to be determined on a case-by-case

basis.[22]

Applying these principles to the circumstances of this case, we conclude that in the absence of E.N.'s consent either express or implied to the formation of a parent-like relationship between T.R. and her children, the first factor of the H.S.H.-K. test has not been satisfied. We consider the first factor of the test as it applies to each parent. At the risk of restating what is already known, G.D. and B.D., the minor children, have two

---

[22]Additionally, it stands to reason that, for purposes of *de facto* parenthood, where a second legal parent has not consented either expressly or impliedly to a third party's formation of a parent-like relationship with a child, as with establishing third party standing to seek custody in general, a parent's knowing and voluntary abandonment of the child may be an exceptional circumstance. As the Court of Special Appeals recently recognized in a custody case, "[a]bandonment is a most serious allegation." Gizzo v. Gerstman, 245 Md. App. 168, 204, 226 A.3d 372, 394 (2020) (citations omitted). Indeed, in Burak, 455 Md. at 648, 168 A.3d at 932, this Court explained that one factor a trial court may consider in determining whether a parent is unfit is whether the parent has abandoned the child. To that end, as the Court of Special Appeals stated in Gizzo, 245 Md. App. at 204, 226 A.3d at 394, in Wakefield v. Little Light, 276 Md. 333, 351, 347 A.2d 228, 238 (1975), in a related context, this Court defined child abandonment as "[a]ny wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely." (Quoting Logan v. Coup, 238 Md. 253, 258, 208 A.2d 694, 697 (1965)). Put plainly, where a parent's actions may "be construed to evince a settled purpose to relinquish all parental claims to" a child, Wakefield, 276 Md. at 351-52, 347 A.2d at 238, *i.e.*, abandoning that child, such abandonment may demonstrate an exceptional circumstance sufficient to permit a trial court to determine *de facto* parentship.

In Logan, 238 Md. at 258, 208 A.2d at 697, we stated that the terms "voluntary relinquishment" and "abandonment," as used in the statute at issue in that case, were essentially synonymous, with only "a fine, but rather slight, distinction between the proper use of the words" being that "'abandon' implies a final and complete relinquishment of something, as because of weariness, discouragement, etc., and 'relinquish' signifies a giving up of something desirable, and connotes force of necessity or compulsion." However, the statute's use of the adjective "voluntary" modifying the word "relinquishment" demonstrated "that the connotation of compulsion [was] removed, and the difference, if any, between 'voluntary relinquishment' and 'abandonment' was minuscule." Id. at 258, 208 A.2d at 697.

existing biological parents—E.N. and D.D. As to D.D., the record establishes that D.D. did not expressly seek *de facto* parenthood status for T.R. The record reveals that D.D. sought for T.R. to have custody of the children via legal guardianship—an arrangement that requires the consent of both parents—while he was incarcerated in federal prison for drug offenses. In a letter that T.R. presented to the circuit court when seeking custody, D.D. wrote one sentence, stating that he "grant[ed] full custody" to T.R. of the children "for legal guardianship while I'm incarcerated."[23] Although D.D. participated in the trial as a witness via telephone and testified about T.R.'s relationship with the children, he did not expressly request that T.R. be made a *de facto* parent.[24]

At bottom, the circumstances of this case are not ones in which one legal parent explicitly sought *de facto* parenthood for a third party. Nonetheless, in this case, irrespective of whether D.D. actually sought *de facto* parenthood or legal guardianship for T.R. or whether he knew that T.R. would seek *de facto* parent status, we agree that, insofar as D.D. is concerned, T.R. satisfied the first factor H.S.H.-K. test by demonstrating that D.D.'s conduct met the requirement that he consent to and foster her formation and establishment of a parent-like relationship with the children. The first factor of the H.S.H.-K. test does not require that the legal parent(s) seek *de facto* parenthood on behalf of a

_____

[23]At oral argument, when asked whether D.D.'s letter requested custody for legal guardianship and not for *de facto* parenthood, T.R.'s counsel was reluctant to answer the question. Ultimately, T.R.'s counsel agreed that, if it were a question of legal guardianship, the consent of both parents was required. The record plainly reflects that in his letter D.D. sought only for T.R. to have legal guardianship.

[24]Likewise, in the initial complaint, T.R. sought custody of the children, but did not request that she be declared a *de facto* parent.

prospective *de facto* parent. Rather, the first factor requires that the legal parent consented to and fostered, the prospective *de facto* parent's formation and establishment of a parent-like relationship with the child. In other words, under the first factor of the H.S.H.-K. test the legal parent who fostered the third party's parent-like relationship with a child may oppose the granting of *de facto* parenthood for the third party but a court may nonetheless grant the third party's request if all of the factors of the test are satisfied, including, where there are two legal parents, the consent of both parents. As such, were D.D. the only legal parent of the children, the analysis of the first factor of the H.S.H.-K. test would be complete.

In this case, however, it is undisputed that the circuit court found that E.N. did not expressly or impliedly consent to or foster T.R.'s parent-like relationship with the children.[25] The circuit court found that, although E.N. knew that D.D. had a "romantic partner," E.N. did not "positively identify" her, know her, or even meet her until November 2017. Referring to the time period between June 2015 and November 2017, the circuit court found that "there was evidence that [E.N.] attempted to locate her children a few times and bring them home[.]" During the time period that the children lived with D.D. and T.R., E.N. visited the children on at least one occasion when she took the children out to dinner with their grandparents. Moreover, the circuit court determined that this case did not involve a voluntary abandonment or surrender of the children on either parent's part.

---

[25]In this case, however, the circuit court determined that implied consent does not satisfy the burden under the first factor and rather that consent needs to be express and explicit. We disagree, as explained above.

The circuit court explicitly found that it was undisputed that both parents were fit as "there was no evidence to the contrary presented through the five days of trial." The circuit court based these factual findings on the evidence adduced at trial and we see no basis on which to determine that the circuit court's findings of fact are clearly erroneous.[26]

We conclude that the record demonstrates, as the circuit court found, that E.N. did not impliedly consent to and foster T.R.'s formation of a parent-like relationship with the children. E.N. did not leave her children for a long period of time in the care of a third party, but instead gave permission for the children to live with D.D., the other legal parent, their biological father, which is not an uncommon occurrence among parents who live separately. E.N. did not object to the children moving in with D.D., but that lack of objection did not extend to a lack of objection to the children forming a parental relationship with T.R., a person whom E.N. lacked knowledge of and her role in the children's lives. In addition, the record demonstrates that, after D.D. was convicted in federal court for drug offenses and incarcerated in federal prison in late 2017, in November 2017, E.N. sought to have her children returned to her.[27] Stated otherwise, once D.D. was

---

[26]Given that T.R. did not allege in the complaint the existence of exceptional circumstances and at trial T.R.'s counsel argued that exceptional circumstances need not be found, the circuit court did not address whether exceptional circumstances existed. We are aware that during argument on E.N.'s motion for judgment at the conclusion of the plaintiff's case, T.R.'s counsel stated that although no showing of exceptional circumstances was required, information from the children showed exceptional circumstances, namely, B.D. indicated that he did not want to "go back to a house with roaches where [he had] to sleep with one cover[.]" Nonetheless, the circuit court did not make a finding as to exceptional circumstances.

[27]At trial, D.D. testified that he was indicted in federal court in May 2017, and that he has been incarcerated since he surrendered on the indictment to law enforcement

incarcerated again, E.N. did not abdicate all parental responsibility for her children to and instead sought to have her children returned to her after they were no longer able to live with their father due to his incarceration.

The circuit court specifically found that although E.N. knew that D.D. had a romantic partner, E.N. did not know T.R. or meet her until November 2017, and E.N. lacked knowledge of T.R.'s importance in the children's lives. The first factor of the test for establishing *de facto* parenthood requires that the legal parent consented to and fostered the petitioner's formation of a parent-like relationship, *i.e.*, that the legal parent consented to and fostered the formation of a parent-like relationship between his or her child and the person seeking *de facto* parent status, not just that one legal parent had knowledge that the other legal parent may have embarked on a relationship with someone who spends time with or lives with a child. See Conover, 450 Md. at 74, 146 A.3d at 447. In this case, the circuit court's finding that E.N. did not consent—either expressly or impliedly—to T.R.'s formation of a parent-like relationship with the children is more than supported by the evidence developed at trial. Nothing in the record supports a determination that E.N., through knowing and voluntary action or inaction, impliedly consented to and fostered T.R.'s formation of a parent-like relationship with the children.

As discussed above, in J.B.R., 336 P.3d at 649-50, the Court of Appeals of Washington interpreted the H.S.H.-K. test prior to the enactment of a *de facto* parent statute

---

authorities that month. The circuit court found that D.D. was "charged and incarcerated for his second drug related activity in late 2017." It is undisputed, however, that E.N. attempted to get her children back in November 2017.

- 63 -

in the State and concluded that *de facto* parenthood could extend to a stepparent who petitions for such status provided that the stepparent established the four factors of the *de facto* parent test, including "that both legal parents consented to the stepparent being a parent to the child[.]" (Emphasis omitted). The circumstances of this case, however, are different from those in J.B.R., 336 P.3d at 653, in which the Court determined that the biological father's choice to not support his daughter or to have a relationship with her for over a decade demonstrated his consent for a third party to establish a parent-like relationship with the child and that the father's complete non-involvement in his child's life for over a decade fostered the child's relationship with the third party. To extent that the Court in J.B.R. determined that the first factor of the *de facto* parent test was satisfied through the implied consent of the biological father, we part ways with the finding insofar as this case is concerned, as the record amply demonstrates that E.N. did not impliedly consent to T.R.'s formation of a parent-like relationship with the children and did not abandon her children.

In K.A.F., 96 A.3d at 982-83, the Appellate Division of the Superior Court of New Jersey concluded that the first factor of the *de facto* parent test requires the consent of only one legal parent and placed weight on the circumstance that the Supreme Court of New Jersey had used references to a singular "legal parent" or "the legal parent" when discussing the factor of consent. Nonetheless, in K.A.F., the Appellate Division of the Superior Court of New Jersey made clear that, in its view, *de facto* parenthood cases are a subsection of cases in which exceptional circumstances may exist for allowing a third party standing to seek custody and that while the *de facto* parent test required the consent of only one legal

parent, the second legal parent's consent is a factor to be considered.  See K.A.F., 96 A.3d

at 980, 983.  As such, the holding by the intermediate court in K.A.F. does not stand for

the proposition that in determining *de facto* parenthood the consent of a second legal parent

is to be entirely ignored.  Moreover, the view that there are no policy reasons that require

two legal parents to consent to and foster a person's parent-like relationship with a child

prior to a court according a person *de facto* parent status fails to account for the

circumstance that the best interest of a child may often be fostered where two parents are

in agreement on basic issues concerning the care, custody, and upbringing of the child.  In

any event, under our holding in this case, such a view is of no consequence because where

one parent may be reluctant to consent or recalcitrant, consent of the second legal parent is

not the only means by which *de facto* parenthood may be established, *i.e.*, a trial court may

consider the non-consenting parent's fitness and whether exceptional circumstances

exist.[28]

Although the first factor of the H.S.H.-K. test as this Court adopted it in Conover

uses the singular (referring to "the biological or adoptive parent"), unlike in K.A.F., we

place no weight on the use of the singular reference.  The use of the singular reference "a

---

[28]In addition, we are mindful of the reasoning that requiring only one parent to consent to the formation of a third party's parent-like relationship with a child should be permissible because the child may have already formed a parent-like relationship with the third party through the consent of one parent.  See K.A.F., 96 A.3d at 981-82.  This reasoning, however, assumes that the other three factors of the *de facto* parent test would be or have been met and that it has already been determined that a parent-like relationship exists sufficient to satisfy the requisite factors.  In other words, this reasoning is based on the notion that because a *de facto* parent relationship has been established (which has yet to be determined), it should not be necessary to have the consent of both parents.

parent" in adopting the H.S.H.-K. test in Conover, was due to the circumstance that in Conover only one biological parent existed. Indeed, H.S.H.-K., 533 N.W.2d at 421-22, involved only one legal parent. In Conover, at bottom, the Court was not confronted with circumstances involving two existing biological or adoptive parents such that rephrasing the first factor of the H.S.H.-K. test to account for two parents was necessary.[29]

In a like vein, we are unpersuaded that the ALI's definition of a *de facto* parent, set forth above, and its use of the singular "a legal parent" mandates a different outcome or that the definition requires the consent of only one legal parent where two legal parents are known. As we noted in Conover, 450 Md. at 62 n.6, 146 A.3d at 439 n.6, the ALI defines a *de facto* parent in relevant part as someone other than a legal parent or a parent by estoppel who, for a significant time of not less than two years, lived with the child and "with the agreement of a legal parent to form a parent-child relationship," performed caretaking functions for the child. (Citation omitted).

As the ALI's definition of *de facto* parent makes clear, a *de facto* parent is distinguishable from a legal parent or parent by estoppel. To be sure, the definition of a parent by estoppel includes in § 2.03(1)(b)(iii) and (1)(b)(iv) the language "agreement with the child's [] parent (or, if there are two legal parents, both parents)[.]" In other words,

---

[29]Also, in Maryland, it is well established that use of the singular includes the plural and vice versa for purposes of construction of statutory provisions and the Maryland Rules. See Md. Code Ann., Gen. Prov. (2014, 2019 Repl. Vol.) § 1-202 ("The singular includes the plural and the plural includes the singular."); Md. R. 1-201(d) ("Words in the singular include the plural[.]"). That principle may apply with equal force to factors of a test adopted or created by this Court unless the Court's holding, or reason, were to dictate otherwise.

according to the ALI's definition of a parent by estoppel, under certain circumstances, a parent by estoppel can be established only by agreement of both legal parents. And, the ALI's definition of *de facto* parent refers simply to "the agreement of a legal parent[.]" Id. at § 2.03(1)(c)(ii).

Nevertheless, the comments to the ALI's definitions of parent by estoppel and *de facto* parent are instructive. With respect to a parent by estoppel, Comment b to the ALI's definitions states that the ALI "treats a parent by estoppel the same as a legal parent" and that, under § 2.03(1)(b)(iii), "[w]hen there are two legal parents, each parent must agree" and that such an "[a]greement may be implied from the circumstances." Id. at § 2.03 cmt. b. Comment b also states that, under § 2.03(1)(b)(iv), "the agreement of each of the child's legal parents" is required and, as with § 2.03(1)(b)(iii), "sometimes the child has only one legal parent. If the child has two legal parents, both parents must agree." In other words, Comment b reaffirms the definitional language of parent by estoppel, as set forth in § 2.03(1)(b)(iii) and § 2.03(1)(b)(iv)—that, where two legal parents exist, both legal parents must agree to the formation of the relationship.

With respect to a *de facto* parent, Comment c to the ALI's definitions states in relevant part:

> The requirements for becoming a de facto parent are strict, to avoid unnecessary and inappropriate intrusion into the relationships between legal parents and their children. The individual must have lived with the child for a significant period of time (not less than two years), and acted in the role of a parent for reasons primarily other than financial compensation. The legal parent or parents must have agreed to the arrangement, or it must have arisen because of a complete failure or inability of any legal parent to perform caretaking functions.

- 67 -

Id. at § 2.03 cmt. c.  Comment c also provides:

> The only circumstance in which a de facto parent may be recognized without the agreement of a legal parent is when there has been a total failure or inability by the legal parent to care for the child.  This circumstance exists only when a parent is absent, or virtually absent, from the child's life, such as when a parent has abandoned the child or has been imprisoned or institutionalized.  While some of these circumstances may be considered beyond the control of the legal parent, they function in the same way to permit to develop the kind of long-term, substitute parent-child relationship that this Chapter seeks to recognize.

Id.  In other words, although the ALI's definition of a *de facto* parent uses the singular "a legal parent[,]" Comment c concerning the definition of *de facto* parent readily supports the conclusion that the ALI requires the agreement of both legal parents, where two legal parents exist, to a third party's formation of a *de facto* parent relationship with a child, with the limited exception of where there has been a total failure or inability by a legal parent to care for the child.[30]  Simply put, the ALI's definitions of parent by estoppel and *de facto* parent and accompanying Comments support our holding that, where two legal parents exist, under the first factor for establishment of *de facto* parenthood, both legal parents must consent to and foster the prospective *de facto* parent's formation of a parent-like relationship with the child. The record in this case is clear that at least one legal parent— E.N., the children's biological mother—did not consent to and foster T.R.'s formation of a

---

[30]ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.04(1) includes a *de facto* parent as one of the parties with standing to bring an action for a custody determination.  Specifically, § 2.04(1)(c) provides that a *de facto* parent, as defined in § 2.03(1)(c), "who has resided with the child within the six-month period prior to the filing of the action or who has consistently maintained or attempted to maintain the parental relationship since residing with the child" "should be given a right to bring an action . . . and to be notified of and participate as a party in an action filed by another[.]"

parent-like relationship with the children. As such, T.R. has not satisfied all four factors of the test to establish herself as a *de facto* parent to the children and the circuit court erred in determining otherwise and in proceeding to analyze the best interests of the children and awarding custody to T.R.

Finally, we observe that in addition to infringing on a parent's individual constitutional right to custody and control of his or her child and being inconsistent with applicable case law concerning standing for third party custody, there are practical concerns attendant to judicially creating a *de facto* parentship without the consent of both legal parents. Creating a *de facto* parentship with the consent of only one parent where there are two fit legal parents and in the absence of exceptional circumstances would result in circumstances that may be unworkable for the legal parents, the *de facto* parent, and the children involved. For instance, "[w]here there are two existing parents, [] permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created[,]" Conover, 450 Md. at 88, 146 A.3d at 455 (Watts, J., concurring), or, as in this case, a fit legal parent being ordered to co-parent with a person who is a stranger to the parent, with further conflict foreordained for the legal parent, the putative *de facto* parent, and children. Moreover, although the circumstances of this case involve one legal parent who is incarcerated and therefore presently unavailable, there will inevitably be circumstances where *de facto* parenthood is sought by a third party in the absence of exceptional circumstances and with both fit legal parents available and involved in a child's life. Under such circumstances, to permit the consent of just one parent to create a third parent with

custodial rights to a child without the consent of the second parent may result in families in Maryland with children being subject to custody and visitation orders between all three or perhaps more fit parents, who have little or no ability to co-parent, and who possibly do not even know each other, a situation that could rarely be seen to be in the best interest of a child.[31] Permitting *de facto* parenthood to be established based on the express or implied consent of both legal parents, where there are two existing legal parents, or a showing of unfitness or exceptional circumstances strikes the appropriate balance between the parent's fundamental right to raise a child and the best interest of the child.

## Conclusion

For the reasons set forth herein, we hold that under the first factor of the test for establishment of *de facto* parenthood—whether the biological or adoptive parent consented to, and fostered, a petitioner's formation and establishment of a parent-like relationship with a child—where there are two legal (biological or adoptive) parents, the prospective *de facto* parent must demonstrate that both legal parents consented to and fostered such relationship, or that the non-consenting legal parent is unfit or exceptional circumstances exist. Accordingly, we reverse the judgment of the Court of Special Appeals in this case. The case is remanded to the Court of Special Appeals with instruction to remand to the

---

[31]We note that this opinion should not be interpreted as a determination that the formation of three-parent or tri-parent families by people who consent is prohibited in Maryland. As our holding in this case makes clear, with the satisfaction of the four factor test for *de facto* parenthood adopted in <u>Conover</u>, including the consent of both parents where there are two legal parents, or in the event that a third party demonstrates the unfitness of a non-consenting legal parent or the existence of expectational circumstances, a third party may become a *de facto* parent.

circuit court for that court to vacate the judgment awarding joint legal custody and sole

physical custody to T.R.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTION TO REMAND TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY TO VACATE JUDGMENT AWARDING CUSTODY TO RESPONDENT. RESPONDENT TO PAY COSTS.**

Circuit Court for Prince George's County
Case No. CAD18-04949
Argued: April 13, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 44

September Term, 2020

_____

E.N.

v.

T.R.

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Dissenting Opinion by Biran, J.,
which Barbera, C.J., joins

_____

Filed: July 12, 2021

Respectfully, I dissent. There is no sound basis in law or policy to require that both legal parents must consent to and foster a third party's parental-type relationship with their child before a family court may recognize the third party as a *de facto* parent with standing to seek custody and visitation. It should suffice that one of the legal parents has consented to the relationship. In my view, the Majority's holding is a step backwards along the path to a modern understanding of the best interests of children, and will inevitably result in judicial determinations that harm children.

In this case, D.D. – one of G.D.'s and B.D.'s legal parents – consented to and fostered T.R.'s parental-type relationship with the children, and T.R. meets all the other requirements for *de facto* parent status under *Conover v. Conover*, 450 Md. 51 (2016). Thus, I would affirm the Court of Special Appeals' holding that T.R. is a *de facto* parent to G.D. and B.D.

**I**

*Conover* involved a same-sex couple who had a child together through artificial insemination of one of the women. *Conover*, 450 Md. at 55. The married couple separated when the child was 17 months old and eventually contested whether the spouse who was not the biological mother of the child had standing to seek visitation of the child. *Id.* Thus, *Conover* involved one extant legal parent, not two as in this case. In *Conover*, this Court adopted Wisconsin's multi-part test for recognition of *de facto* parent status with respect to a minor child, which requires that a third party who seeks such status show:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;

(2) that the petitioner and the child lived together in the same household;

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 74 (quoting *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 435-36 (Wis. 1995)). We observed that "these factors set forth a high bar for establishing *de facto* parent status, which cannot be achieved without knowing participation by the biological parent." *Id.* Notably, we incorporated the *H.S.H.-K.* test into Maryland's common law without altering the first factor to require that all biological or adoptive parents of a child must have consented to, and fostered, the would-be *de facto* parent's formation and development of a parent-like relationship with the child. Rather, we referred to "the biological or adoptive parent" in the singular. *Id.* at 74.

The significance of the singular "parent," rather than the plural "parents," to future cases was not lost on the members of the *Conover* Court. In a Concurring Opinion, Judge Shirley M. Watts (joined by Judge Lynne A. Battaglia) explained that, by incorporating the first factor of the *H.S.H.-K.* test without alteration, "the Majority [held] that only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent." *Id.* at 455 (Watts, J., concurring). Judges Watts and Battaglia concurred in the Majority's recognition of *de facto* parent status in Maryland, but declined to join the Majority Opinion. In their view, in adopting the *H.S.H.-K.* test – in particular, the first

- 2 -

factor of that test – the Majority created "a standard that is too broad." *Id.* at 87. The concurring judges further stated that the Majority Opinion "does citizens, and particularly the children, of Maryland a disservice by not including additional protections to ensure that children and families are not overburdened by the custody and visitation demands of multiple parents, and by not including the limitation that, in circumstances where there are two existing parents, both parents need to have notice of, and the opportunity to consent to, the *de facto* parentship of a third party." *Id.* at 94.

The *Conover* Majority did not disclaim Judge Watts's interpretation of the Majority Opinion. That is, the Majority did not say that it was only holding that the *H.S.H.-K.* test, as set forth in the Majority Opinion, was applicable to cases where there was one extant legal parent. Nor did the Majority say that it was expressing no opinion as to the hypothetical two-parent situation with which the Concurrence was concerned. To the contrary, in a footnote, the *Conover* Majority seemingly acknowledged the Concurrence's concern about overburdening children and families with custody and visitation demands of multiple parties: "In deciding whether to award visitation or custody to a *de facto* parent, the equity court should also take into account whether there are other persons who have already been judicially recognized as *de facto* parents. A court should be very cautious and avoid having a child or family … be overburdened or fractured by multiple persons seeking access." *Id.* at 75 n.18. Thus, rather than modifying the first prong of the *H.S.H.-K.* test, as suggested by the Concurrence, to eliminate standing for the third party unless both legal parents consented to the creation of the *de facto* parental relationship, the *Conover* Majority indicated that trial judges should address potential "overburdening" in the course of

assessing the claims of all parties with standing, including *de facto* parents.

In this case, the Court of Special Appeals agreed with Judge Watts's assessment in her Concurring Opinion that the *Conover* Majority adopted a requirement that, regardless of whether there is one legal parent or more than one legal parent, only one legal parent need consent to and foster a third party's parental-type relationship in order to satisfy the first prong of the *H.S.H.-K.* test. *See E.N. v. T.R.*, 247 Md. App. 234, 245-47 (2020). However, the Majority now adopts the position that the *Conover* Majority declined to accept, and creates a new requirement for recognition of *de facto* parent status where a child has two legal parents. In such a situation, the Majority holds, both legal parents must consent to and foster the creation of a parental caregiving relationship between a third party and a child in order for the third party potentially to qualify as a *de facto* parent. The Majority stakes out this new position on the grounds that a contrary holding: (1) "undermines and, essentially, negates [the nonconsenting] parent's constitutional right to the care, custody, and control of the parent's children," Maj. Op. at 51; (2) "runs afoul of … basic family law principles," *id.*; and (3) "would potentially create circumstances that are untenable for all involved." *Id.* at 54. Respectfully, I disagree with all of these contentions.

Of course, it is "well-established that the rights of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution." *Conover*, 450 Md. at 60. However, it is equally well-established that a legal parent's constitutional right to parent a child is not absolute. *See, e.g.*, *In re Mark M.*, 365 Md. 687, 705 (2001) (a parent's interest

- 4 -

in raising a child, while a fundamental right, "is not absolute and does not exclude other important considerations"). As we stated in *Taylor v. Taylor*, one of this Court's most consequential custody cases, "in any child custody case, the paramount concern is the best interest of the child." 306 Md. 290, 303 (1986). "[W]e have variously characterized this standard as being 'of transcendent importance' and the 'sole question'" in such cases. *Id.* (quoting *Ross v. Hoffman*, 280 Md. 172, 175 n.1 (1977)). "The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak." *Id.* Thus, "while a parent has a fundamental right to raise his or her own child, … the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell v. Boswell*, 352 Md. 204, 219 (1998); *see also In re Adoption/Guardianship of C.A. and D.A.*, 234 Md. App. 30, 54 (2017) ("[A] child's best interests *do* trump the parent's liberty interest in maintaining his relationship with a child."). The fundamental flaw in the Majority's holding is that, by eliminating the ability to consider a parental-type relationship that has developed in the life of a child (barring a finding of parental unfitness or "exceptional circumstances"), it prevents a family court from fully assessing and furthering the child's best interests in its custody determination.

Moreover, in my view, it is inaccurate to say that the trial court's and intermediate appellate court's holding in this case negates a nonconsenting parent's right to parent their child. The Majority seemingly views this a zero-sum situation: if the would-be *de facto* parent is given standing, the nonconsenting legal parent somehow becomes less of a parent. I do not see it that way. First of all, we are considering a question of standing, which gives

a party the opportunity to address the best interests of the child in court. The family court in any particular case may decide not to award custody or visitation to a *de facto* parent.[1] But even in those cases where the family court awards both the legal parent(s) and a *de facto* parent custody and/or access to the child, the nonconsenting legal parent remains a parent to the child. The nonconsenting parent may have to share custody and/or access with a third person to some extent, but they retain their ability to live with the child, take care of the child, and make decisions about the child's welfare and upbringing. This undoubtedly satisfies the Fourteenth Amendment.

In my view, the Majority errs by failing to give any weight to the rights of children to maintain relationships with parental-type caregivers after those relationships have been formed and fostered for a significant period of time by at least one legal parent. To be sure, a legal parent has a fundamental right to parent their child, but that right must be balanced in each case against the harm that will befall a child if a relationship with another parental figure is severed. The only way a court can undertake that balancing analysis is if all parties who have maintained a parent-child relationship for a significant period of time have standing to make their case for custody and access to the child.

The Majority further reasons that allowing a nonconsenting legal parent to unilaterally sever a psychological bond between a third party and a child that was fostered

---

[1] As discussed below, a legal parent should be entitled to various preferences in a custody dispute with a *de facto* parent, provided that the legal parent exercised a reasonable amount of parenting functions prior to the dispute. This further diminishes any concern about "undermining" or "negating" a nonconsenting legal parent's constitutional right to parent a child by affording standing to a person who has formed and developed a parent-child relationship with the consent of another legal parent.

by another legal parent is consistent with this Court's prior family law cases, specifically "case law holding that third party intervention for custody requires a showing of unfitness or exceptional circumstances." Maj. Op. at 53-54. The problem with the Majority's position is that we are not dealing here with "any third party." *See Conover*, 450 Md. at 71-72 (quoting *Smith v. Guest*, 16 A.3d 920, 931 (Del. 2011) ("This is not a case … where a third party having no claim to a parent-child relationship (e.g., the child's grandparents) seeks visitation rights. Guest is not 'any third party.' Rather, she is a [] *de facto* parent who …would also be a legal 'parent' of [the child].")). To the contrary, we are considering a parental-type relationship in which a psychological bond has developed between the putative *de facto* parent and a child. As we explained in *Conover*, "the importance – for legal purposes – of a psychological bond between a child and non-parent confirms the notion that *de facto* parenthood is distinct from pure third party status." *Id.* at 77; *see also id.* at 76-77 (quoting *Monroe v. Monroe*, 329 Md. 758, 775 (1993), an exceptional circumstances case: "Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances … is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and … encouraged by the biological parent."). The psychological bond between a putative *de facto* parent and child is no less real where the parent-child relationship has been fostered by only one of two legal parents. It stands to reason that a putative *de facto* parent's status as

a "pure third party" – and, therefore, whether they must show unfitness of the legal parent or exceptional circumstances to have standing – does not depend on whether only one or both legal parents fostered the relationship and psychological bond with the child. If the relationship has developed over a significant period of time in which the adult performed caregiving functions for the child as a member of the same household, the putative *de facto* parent is not a "pure third party," regardless of whether only one legal parent or both legal parents fostered the relationship and bond. It follows that, where either legal parent has consented to and fostered the relationship, a putative *de facto* parent need not show the unfitness of the nonconsenting parent or the existence of exceptional circumstances in order to have standing to seek custody or visitation.

The Majority's contrary rule leads to the result that D.D. would not be permitted to sever the bond that T.R. formed with G.D. and B.D. because D.D. consented to and fostered that relationship, but E.N. is allowed to sever that bond because she did not consent to and foster it. This begs the question: From the perspective of G.D. and B.D., what difference does it make which legal parent is the instrument of their not being able to have a relationship with T.R. any longer? They will feel the loss of this relationship – the only relationship they had with a maternal figure for several years – regardless of which of their legal parents is the cause. *See* American Law Institute, *Principles of the Law of Family Dissolution: Analysis and Recommendations* (2003) (adopted May 16, 2000) (the "ALI Principles") § 2.08 cmt. d ("From the child's point of view, what matters is how he or she was cared for and by whom, not why."); *see also* Joseph Goldstein, Anna Freud & Albert J. Solnit, *Beyond the Best Interests of the Child* 19 (1979) ("Whether any adult becomes

the psychological parent of a child is based thus on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by an adoptive parent or by another other caring adult – but never by an absent, inactive adult, whatever his biological or legal relationship to the child may be.").

The Majority justifies this perverse result by postulating that the lower courts' ruling creates "the incomprehensible situation in which a *de facto* parentship may be created by the knowing participation of only one legal parent while an equally fit legal parent is denied the same knowing participation in the process and denied the meaningful input that we deemed so critical for a parent to have in creating *de facto* parent status for a third party." Maj. Op. at 57. But the Majority's position ignores a reality that all parents understand when they have a child: the union that produced the child may not last forever. Thus, it is reasonably foreseeable to any legal parent at the time a child is born that there may come a day when the other legal parent will "invite[] a third party into a child's life," and thereby "alter a child's life by essentially providing him with another parent." *Marquez v. Caudill*, 656 S.E.2d 737, 744 (S.C. 2008). When they have the child, the two legal parents typically do not know whether the union will end and, if so, which one of them may consent to and foster a parental-type relationship between the child and a new partner. All they usually know at the time they bring the child into the world is that it is possible they will not be the only two people who ever form a parental-type psychological bond with their child.

I do not in any way minimize the pain and frustration that a legal parent of a child may feel about a third person – without the legal parent's consent – having developed a psychological bond with their child and then seeking *de facto* parent status and an

allocation of custody. But the nonconsenting parent's understandable anguish is not a sufficient reason to empower that parent unilaterally to sever the parental-type psychological bond that the would-be *de facto* parent has formed with the child through no fault of the adult or child. When a person becomes one-half of a union that produces a child, they assume the risk that they one day may be confronted with this very situation. In short, although it undoubtedly can be very difficult for a nonconsenting parent to accept that a bond has formed between a new partner and their child sufficient to confer *de facto* parent status, it is not "incomprehensible."

The Majority's policy arguments also are unpersuasive. The Majority is concerned that the lower courts' ruling could lead to, "as in this case, a fit legal parent being ordered to co-parent with a person who is a stranger to the parent, with further conflict foreordained for the legal parent, the putative *de facto* parent, and children." Maj. Op. at 69. It is not clear how the Majority is able to divine that conflict is "foreordained" in all such cases. Certainly, the family court in some cases may be concerned about the potential for conflict and can tailor its custody and access orders accordingly. In other cases, however, two adults who did not previously know each other well (or even at all), but who both have the best interests of a child at heart, may well find a way to co-parent effectively. Indeed, it may even be the case that, because they do not have a prior romantic history complicating their relationship, a legal parent and *de facto* parent may end up co-parenting more effectively than two legal parents sometimes do.

This is exactly the type of point that should be considered by a family court that has all the parties before it and is able to delve into the unique dynamics of the case. Those

unique dynamics may militate in some cases toward awarding only a small amount of physical custody to the *de facto* parent and awarding legal custody solely to the legal parent(s). In other cases, such as this one, the best interests of the child may result in an order of joint legal custody. The Majority does Maryland children a disservice by adopting a blanket rule that prevents family courts from considering the unique facts and circumstances of these situations and, in appropriate cases, allowing the parties the opportunity to try to work together in the best interests of a child.

The Majority's concern about a child having three or more fit parents, "who have little or no ability to co-parent, and who possibly do not even know each other," Maj. Op. at 70, also does not provide support for the rule the Majority adopts today. Even if I felt confident enough to opine, as the Majority does, that such "a situation could rarely be seen to be in the interest of a child," *id.*, the Majority's formulation proves my point. If legal recognition of a tri-parent family, without the consent of all three parents, even "rarely" will be in the best of interest of the affected child, this Court should allow a family court to determine if the matter before it is one such case. To be sure, as this Court said in *Conover*, in response to Judge Watts's point along these lines in her Concurring Opinion, "[a] court should be very cautious and avoid having a child or family … be overburdened or fractured by multiple persons seeking access." *Conover*, 450 Md. at 75 n.18. But this advisement by the *Conover* Majority presupposes that the decision is the family court's to make after hearing evidence and being able to inquire of all parties and their counsel. In my view, the Majority here errs to the detriment of Maryland children and families by

taking such determinations away from the family court.[2]

By constraining the family court's ability to assess these cases based on their individual circumstances, the Majority's holding will lead to undesirable results. First and foremost, it will lead to psychological harm for children as they suffer the sudden loss of a parental-type relationship. Further, it will disincentivize people like T.R. from filling a void left by a parent who, for whatever reason, is not present for their children for a substantial period of time. This will not be a good outcome for children who find themselves in situations similar to the one G.D. and B.D. faced.

The Majority's references to the ability of a third party to obtain standing by showing parental unfitness or exceptional circumstances, *see, e.g.*, Maj. Op. at 65, 69-70, are not reassuring, because those mechanisms do not solve the problem the Majority creates by requiring two-parent consent for all the other cases that do not fall into either of these two categories. The psychological bond between a would-be *de facto* parent and a child – and the harm that may befall the child if that bond is severed – is no less real where a nonconsenting parent is fit or where a court otherwise would not find the presence of exceptional circumstances.[3]

---

[2] As discussed below, the ALI Principles make a similar point in the course of noting a preference for legal parents and parents by estoppel over *de facto* parents in cases where, "in light of the number of other adults to be allocated responsibility, the allocation is impractical." ALI Principles § 2.18 cmt. b.

[3] If the Majority were of the view that the existence of a psychological bond between a child and a parental-type figure, developed with the consent of one legal parent over a significant period of time, qualified in every instance as "exceptional circumstances," that would, of course, alleviate my concerns. However, I do not understand that to be the Majority's position.

I find further support for the lower courts' ruling from other jurisdictions and from the ALI Principles. As the Majority explains, in *K.A.F. v. D.L.M.*, 96 A.3d 975 (N.J. Super. Ct. App. Div. 2014), the court held that the first factor of the *H.S.H.-K.* test requires the consent of only one legal custodial parent. There, one of the child's two legal parents (K.A.F.) initially consented to and fostered a parental-type relationship between her new partner, D.M., and the child. *Id.* at 978. The child's other legal parent (F.D.) opposed D.M.'s relationship with the child at all times. *Id.* By the time the case came to court, both K.A.F. and F.D. opposed D.M.'s claim of *de facto* parent status and her request for custody and visitation. *Id.* The trial court dismissed D.M.'s claim on the ground that F.D. had always opposed the parent-like relationship, holding that "where there are two fit and involved parents, both must have consented to the creation of a psychological parent relationship before a third party can maintain an action for visitation and custody based on the existence of that relationship." *Id.*

The appellate court reversed, explaining that it "fail[ed] to perceive any basis for th[e] argument either in the law or the policies underlying the concept of a psychological parent." *Id.* at 979. The court opined that "it would be difficult to ignore the 'psychological harm' a child might suffer because he is deprived of the care of a psychological parent simply because only one of his 'legal parents' consented to the relationship." *Id.* at 981. The court further explained that the "clear policy underlying" prior New Jersey Supreme Court rulings regarding "exceptional circumstances" cases

> is that "exceptional circumstances" may require recognition of custodial or
> visitation rights of a third party with respect to a child where the third party
> has performed parental duties at home for the child, with the consent of a

legal parent, however expressed, for such a length of time that a parent-child bond has developed, and terminating that bond may cause serious psychological harm to the child. It is fatuous to suggest that this fundamental policy may be subverted, and that a court may not even examine the issue at a plenary hearing, where one of the child's legal parents colorably claims lack of consent, in circumstances where the other legal parent has consented. If we were to accept the arguments of K.A.F. and F.D., a court would be powerless to avert harm to a child through the severance of the child's parental bond with a third party.

*Id.* at 981-82 (citations omitted). The court further explained:

Nothing in the historical development of the psychological parent policy, in the policy itself, or in the language of the Court, therefore, suggests that both legal parents must consent before a court may consider a claim of psychological parenthood by a third party. Rather, it is sufficient if only one of the legal custodial parents has consented to the parental role of the third party. In that circumstance, a legal custodial parent has voluntarily created the relationship and thus has permitted the third party to enter the zone of privacy between her and her child.

*Id.* at 983.

Like the New Jersey appellate court, I believe it is crucial that one of the legal parents must "voluntarily create[] the relationship and thus … permit[] the third party to enter the zone of privacy between her and her child," *id.*, but that only one legal parent need do so for the third party potentially to qualify as a *de facto* parent.[4]

---

[4] As the Majority notes, the *K.A.F.* Court added that a legal parent's consent, or lack thereof, to a third party's relationship with the parent's child "may be used by a trial court, in an appropriate context, as one factor among many in determining whether a third party has established that he or she is a psychological parent of a child, and, if so, whether the 'best interests' of the child warrant some form of custody or visitation." *Id.* at 983. Given this language, the Majority opines that the *K.A.F.* Court's holding "does not stand for the proposition that in determining *de facto* parenthood the consent of a second legal parent is to be entirely ignored." Maj. Op. at 65. Nevertheless, it is clear that the Majority's holding today is at odds with *K.A.F.*, in that the Majority requires a showing of consent by the second legal parent to the formation of the parental-type relationship between the putative

The Majority disagrees with *K.A.F.*'s holding and, instead, prefers that of the Washington Court of Appeals in *In re Parentage of J.B.R.*, 336 P.3d 648 (Wash. App. Ct. 2014). In summarizing its holding in the first paragraph of the opinion in *J.B.R.*, the intermediate appellate court of Washington stated that the doctrine of *de facto* parentage "may be extended to a stepparent of a child with *two* legal parents … if the stepparent petitioner establishes that *both* legal parents consented to the stepparent being a parent to the child." *Id.* at 649-50. However, in the body of the opinion, the court provided no analysis explaining why the consent of both legal parents is necessary. Instead, the court focused on the long-absent biological father's implied consent for the biological mother's partner to fill the vacant paternal role. *See id.* at 653.

Notably, in 2018, the Washington State Legislature superseded *J.B.R.*'s holding when it enacted a statute entitled "Adjudicating claim of de facto parentage of child." Wash. Rev. Code Ann. § 26.26A.440 (2019). Pertinent to the issue before us, the new statute provides:

> In a proceeding to adjudicate parentage of an individual who claims to be a de facto parent of the child, the court shall adjudicate the individual who claims to be a de facto parent to be a parent of the child if the individual demonstrates by a preponderance of the evidence that:
>
>    (a) The individual resided with the child as a regular member of the child's household for a significant period;
>
>    (b) The individual engaged in consistent caretaking of the child;
>
>    (c) The individual undertook full and permanent responsibilities of a

*de facto* parent and the child. In my view, the consent of the second legal parent (or the lack thereof) is properly considered as part of the best interests analysis, not in deciding whether the first prong of the *H.S.H.-K.* test has been met.

parent of the child without expectation of financial compensation;

(d) The individual held out the child as the individual's child;

(e) The individual established a bonded and dependent relationship with the child which is parental in nature;

(f) *Another parent of the child fostered or supported the bonded and dependent relationship required under (e) of this subsection*; and

(g) Continuing the relationship between the individual and the child is in the best interest of the child.

*Id.* § 26.26A.440(4) (emphasis added).

The Washington Court of Appeals has explained that the "parental support" requirement set forth in § 26.26A.440(4)(f) only requires a showing that one legal parent "fostered or supported" the requisite "bonded and dependent relationship." *Matter of L.J.M.*, 476 P.3d 636, 644 (Wash. Ct. App. 2020) (noting that "RCW 26.26A.440(4)(f) does not reference the child's other genetic parent. The only requirement is that one parent – '[a]nother parent' – support the petitioner's relationship with the child.") (emphasis removed). The court acknowledged that "[t]he court in *J.B.R.* analyzed under the common law whether both biological parents fostered and supported the petitioner's relationship with the child," but recognized that the new statute takes a different approach by "clearly refer[ring] to '[a]nother parent,' not both parents." *Id.* at 644-45 n.4.

Thus, to the extent the Majority relies on *J.B.R.* as support for its holding that both legal parents' consent is required to create a *de facto* parentship, it not only relies on a case

that provided no reasoned analysis,[5] but also has no effect under current Washington law. To the contrary, the Washington State Legislature has codified the approach taken by the Court of Special Appeals in this case.

As the Majority notes, in *Conover*, this Court cited the ALI Principles favorably. *See Conover*, 450 Md. at 81 (citing §§ 2.03 and 2.04 of the ALI Principles and noting that the ALI "has recommended expanding the definition of parenthood to include *de facto* parents and includes a *de facto* parent as one of the parties with standing to bring an action for the determination of custody, subject to the best interests of the child analysis"). Section 2.03 of the ALI Principles includes three types of parents in its definition of a "parent": (1) a "legal parent"; (2) a "parent by estoppel"; and (3) a "*de facto* parent."

For our purposes, a "legal parent" is a biological or adoptive parent. *See Conover*, 450 Md. at 74. Under the ALI Principles, a "parent by estoppel" is "an individual who, though not a legal parent,"

> (i)     is obligated to pay child support …; or
> (ii)    lived with the child for at least two years and
>> (A)    over that period had a reasonable, good-faith belief that he was the child's biological father, based on marriage to the mother or on the actions or representations of the mother, and fully accepted parental responsibilities consistent with that belief, and
>> (B)    if some time thereafter that belief no longer existed, continued to make reasonable, good-faith efforts to accept responsibilities as the child's father; or
> (iii)   lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-

---

[5] The Majority asserts that, "[d]espite subsequent changes in Washington law establishing a different test, in *J.B.R.*, the Court of Appeals of Washington necessarily interpreted the four factors of the *H.S.H.-K.* test for establishment of *de facto* parenthood[.]" Maj. Op. at 43 n.18. However, one searches *J.B.R.* in vain for any substantive analysis bearing on the question of one-parent versus two-parent consent.

> parenting agreement with the child's legal parent (or, if there are two legal parents, both parents) to raise a child together each with full parental rights and responsibilities, when the court finds that recognition of the individual as a parent is in the child's best interests; or
>
> (iv)  lived with the child for at least two years, holding out and accepting full and permanent responsibilities as a parent, pursuant to an agreement with the child's parent (or, if there are two legal parents, both parents), when the court finds that recognition of the individual as a parent is in the child's best interests.

ALI Principles § 2.03(1)(b).

The ALI Principles' definition of a *de facto* parent is substantially similar to the one we adopted in *Conover*. Under the ALI's definition, a *de facto* parent is "an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,"

> (i)  lived with the child and,
> (ii)  for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship or, as a result of a complete failure or inability of any legal parent to perform caretaking functions,
>
>> (A)  regularly performed a majority of the caretaking functions for the child, or
>> (B)  regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.

*Id.* § 2.03(1)(c).

Notably, the ALI's definition of a parent by estoppel based on the existence of a prior agreement (§§ 2.03(1)(b)(iii) and (iv)) explicitly refers to the agreement having been made with both legal parents, if there are two legal parents. In contrast, the text of the definition of a *de facto* parent does not refer to "both parents." Rather, § 2.03(c)(ii) refers to the formation of a parent-child relationship with "the agreement of a legal parent" or "as

a result of a complete failure or inability of any legal parent to perform caretaking functions." Thus, as I read the definitions in the ALI Principles, the ALI distinguishes between a parent by estoppel and a *de facto* parent with respect to the consent necessary to create these different types of third-party parent. In this regard, it is telling not only that the definition of a *de facto* parent uses the singular when referring to the agreement of "a legal parent," but also that it uses the singular when addressing the "complete failure or inability of *any* legal parent to perform caretaking functions." (Emphasis added). That is, if neither of two legal parents consents to the formation of a parental-type relationship, but the relationship nevertheless arises due to the "complete failure or inability" of the legal parent with whom the third party lives to perform caretaking functions, the ALI Principles will recognize the third party as a *de facto* parent (assuming the other necessary conditions are met). Suppose, for example, that D.D. had not fostered a parental-type relationship between T.R. and the children before 2017, but instead of being incarcerated at that time, he was incapacitated by a stroke, after which T.R. became the children's primary caregiver, thereby forming a psychological bond with them. In that instance, according to the ALI's definition of *de facto* parent, T.R. might qualify for *de facto* parent status, regardless of whether E.N. had knowledge of or consented to the relationship.

Contrary to the Majority's interpretation of the comments to the relevant definitions, I find that the comments provide further support for the conclusion that the ALI views the consent of one legal parent to be sufficient to potentially confer *de facto* status. The comment to § 2.03(1)(b)(iii) explicitly states that, for a parent-by-estoppel relationship to be created by virtue of a co-parenting agreement, if there are more than two extant legal

- 19 -

parents, "each parent must agree" to the co-parenting agreement. With respect to co-parenting arrangements that come into effect after the child's birth, § 2.03(1)(b)(iv) also requires that, if there are two or more extant legal parents, all such legal parents agree to the co-parenting arrangement by which a third party agrees to accept "full and permanent responsibilities as a parent." *Id.* cmt. b(iv).

As the Majority notes, in the introductory portion of the comment to the *de facto* parent definition, the comment states that the "legal parent or parents must have agreed to the arrangement" by which the would-be *de facto* parent formed the parent-child relationship. *Id.* cmt. c. Significantly, however, the ALI here does not repeat the phrase "each parent must agree" that it uses a few pages earlier when discussing the parent-by-estoppel definition. Moreover, in the portion of the comment specifically addressing consent, the *de facto* parent comment does not repeat the phrase "or parents." Rather, the comment provides:

> *(iii) Agreement of **a parent** to the de facto parent relationship.* Like a parent-by-estoppel status, a de facto parent relationship cannot arise by accident, in secrecy, or as a result of improper behavior. The agreement requirement of Paragraph (1)(c)(ii) limits de facto parent status, in most circumstances, to those individuals whose relationship to the child has arisen with knowledge and agreement of **the legal parent**. Although agreement may be implied by the circumstances, it requires an affirmative act or acts by **the legal parent** demonstrating a willingness and an expectation of shared parental responsibilities….
>
> The only circumstance in which a de facto parent may be recognized without the agreement of **a legal parent** is when there has been a total failure or inability by **the legal parent** to care for the child. This circumstance exists only when **a parent** is absent, or virtually absent, from the child's life, such as when **a parent** has abandoned the child or has been imprisoned or institutionalized. While some of these circumstances may be considered beyond the control of **the legal parent**, they function in the same way to

- 20 -

permit to develop the kind of long-term, substitute parent-child relationship that this Chapter seeks to recognize.

*Id.* cmt. c(iii) (emphasis added).

Finally, the comment explains that, in order to be a *de facto* parent, the individual either must have performed the majority share of caretaking functions for the child, or must have performed a share of caretaking functions that was equal to or greater than that performed by the parent with whom the child primarily lived. *Id.* cmt. c(v). With respect to the second of these possibilities, the comment notes: "An individual who is sharing caretaking responsibility equally with a child's only other parent will meet this criterion. So will an individual who is sharing caretaking responsibility for a child whose parents live in different households, if the child lives primarily in the household in which that individual also lives and the individual performs at least as much caretaking responsibility as the parent in that household." *Id.* This part of the comment says nothing about the nonresident parent necessarily having any knowledge of, or consenting to, the third party's equal or greater caretaking role in the household. Nor is such knowledge something that a nonresident parent would be expected to have. However, the third party's share of caretaking functions in the household *is* something the resident parent would know about and consent to. In my view, this is key to the creation of *de facto* parent status, at least according to the ALI.

Based on the texts of the ALI's definitions and a careful reading of the relevant comments, I conclude that the ALI requires a greater showing with respect to consent for recognition as a parent by estoppel than it does for recognition as a *de facto* parent. This

makes sense because, under the ALI Principles, a parent by estoppel has taken on greater responsibilities than a *de facto* parent and, as a result, also has greater rights than a *de facto* parent with respect to custody.

Whereas a *de facto* parent has "regularly performed a majority of the caretaking functions for the child, or … regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived," *id.* § 2.03(1)(c)(ii),[6] a parent by estoppel, pursuant to a prior agreement with the legal parent(s), has "accept[ed] full and permanent responsibilities as parent," *id.* §§ 2.03(1)(b)(iii) & (iv), including financial obligations. Full and permanent responsibilities as a parent include performing "parenting functions," which the ALI Principles define to include the same "caretaking functions" a *de facto* parent has performed, *as well as* providing economic support, participating in decisions concerning the child's welfare, maintaining or improving the family residence, doing and arranging financial planning and organization, car repair and maintenance (and other tasks supporting the consumption and savings needs of the household), and "performing any other functions that are customarily performed by a

---

[6] The ALI Principles define "caretaking functions" as "tasks that involve interaction with the child or that direct, arrange, and supervise the interaction and care provided by others," including (among other things) satisfying the child's nutritional needs, managing the child's bedtime and wake-up routines, caring for the child when sick or injured, protecting the child's physical safety, providing transportation, directing the child's various developmental needs (such as toilet training and the acquisition of motor and language skills), attending to the child's needs for behavioral control and self-restraint (such as by providing discipline), arranging for the child's education, communicating with teachers and counselors, supervising homework, helping the child to develop and maintain appropriate interpersonal relationships with peers, siblings, and other family members, and arranging for healthcare providers, medical follow-up, and home health care. *Id.* § 2.03(5).

parent or guardian and that are important to a child's welfare and development." *Id.* § 2.03(6)(e).

Given the relatively greater responsibilities of a parent by estoppel, the ALI Principles also provide, in general, relatively greater rights of custody and access to parents by estoppel than to *de facto* parents – indeed, the ALI Principles provide parents by estoppel with rights that are equal to those of legal parents. First, the Principles provide that legal parents and parents by estoppel who have performed a reasonable share of parenting functions should receive an allocation of custodial responsibility that is "not less than a presumptive amount of custodial time set by a uniform rule of statewide application." *Id.* § 2.08(1)(a). There is no similar requirement requiring an allocation of custodial responsibility to a *de facto* parent. Second, "[t]he court should presume that an allocation of decisionmaking responsibility jointly to each legal parent or parent by estoppel who has been exercising a reasonable share of parenting functions is in the child's best interests." *Id.* § 2.09(2).[7] Third, "[t]he court should not allocate the majority of custodial responsibility to a de facto parent over the objection of a legal parent or parent by estoppel who is fit and willing to assume the majority of custodial responsibility unless (i) the legal parent or parent by estoppel has not been performing a reasonable share of parenting functions, as defined in § 2.03(6), or (ii) the available alternatives would cause

---

[7] The ALI defines "decisionmaking responsibility" as "authority for making significant life decisions on behalf of the child, including decisions about the child's education, spiritual guidance, and health care." *Id.* § 2.03(4). Thus, "[d]ecisionmaking responsibility is the [ALI Principles'] term for what most states call 'legal custody.'" *Id.* § 2.03 cmt. f.

harm to the child." *Id.* § 2.18(1)(a). Fourth, "an allocation that would otherwise be made to a de facto parent may be limited or denied if, in light of the number of other adults to be allocated responsibility, the allocation is impractical." *Id.* § 2.18 cmt. b.

In sum, the ALI Principles provide that, before a person is recognized as a parent by estoppel, who is entitled to custodial rights *equal to that of a legal parent*, both legal parents must have consented to the co-parenting arrangement that predated the custody dispute. However, given that a *de facto* parent is not entitled to the same rights as a legal parent or a parent by estoppel, a *de facto* parent need not show that both legal parents consented to the formation of the psychological bond between the third person and the child.

For all the above reasons, I would retain the *Conover* test for *de facto* parent status without alteration. There is no sound reason to require that both legal parents consent to a third party's formation of a parental bond with a child sharing the same household in order for *de facto* parent status to be recognized. As the Majority explains, "*de facto* parent" means "parent in fact." Maj. Op. at 1. Nothing in the Majority Opinion can change the fact that a meaningful and psychologically important parental-type bond can be formed with the consent of only one legal parent.

The Majority's holding requiring that both legal parents consent to the relationship in order to prevent one of the parents from severing that bond inevitably will result in judicial determinations that harm children. In my view, the better course of action is to allow the circuit court, regardless of whether one or both of a child's legal parents consented to the parental-type relationship, to consider all the facts and circumstances of

each case and allocate custody among legal parents and *de facto* parents in furtherance of the best interests of the child. This is in accord with the principles stated in *Taylor v. Taylor* and other Maryland cases that have recognized that the best interests of the child take precedence over all other interests, including a legal parent's liberty interest in raising a child. *See, e.g.*, *Taylor*, 306 Md. at 303; *Boswell*, 352 Md. at 219; *see also* ALI Principles § 2.02 cmt. b (noting that the primary objective of the Principles' Chapter on custodial and decisionmaking responsibility is "serving the child's best interests. The priority of the child's interests over those of the competing adults is premised on the assumption that when a family breaks up, children are usually the most vulnerable parties and thus most in need of the law's protection."). Regrettably, the Majority loses sight of that goal through its overemphasis of the rights of a nonconsenting parent.

## II

Applying the *Conover* test without alteration, I would affirm the Court of Special Appeals' holding that T.R. is a *de facto* parent to G.D. and B.D. It is undisputed that D.D., a legal parent to the two children, consented to and fostered the parental relationship between T.R. and the children. That is sufficient to establish the first part of the *H.S.H.-K.* test as adopted in *Conover*. It is undisputed that T.R. meets all the other parts of the *H.S.H.-K.* test. That is, T.R. lived with G.D. and B.D. in the same household; she assumed obligations of parenthood by taking significant responsibility for the children's care, education, and development, including contributing towards their support, without expectation of financial compensation; and she fulfilled this parental role for a length of time sufficient to have established with the children a bonded, dependent relationship,

- 25 -

parental in nature. *See Conover*, 450 Md. at 74.

Although generally it is appropriate to afford a preference to legal parents in the allocation of legal and physical custody when the dispute is between a legal parent and a *de facto* parent, *see* ALI Principles §§ 2.08(1)(a), 2.09(2) & 2.18(1)(a), that preference does not apply when the legal parent has not been "exercising a reasonable share of parenting functions." *See id.* § 2.18 cmt. b. Because it is clear from the record that E.N. voluntarily absented herself from the children's lives for more than two years after they moved in with D.D., and indeed largely was an absent parent for the two years preceding their move, the circuit court's allocation of legal and physical custody between E.N. and T.R. was reasonable.[8] The Court of Special Appeals summarized some of the trial court's "salient

---

[8] Although the Majority's discussion of implied consent is not germane to the issue that causes me to dissent, I do have concerns about the Majority's treatment of implied consent. It seems that the Majority would require that, unless a legal parent has *abandoned* a child, to establish implied consent the putative *de facto* parent must show that the legal parent had actual knowledge of the identity of the *de facto* parent and the nature of the *de facto* parent's relationship with the child. That sets too a high a bar for a finding of implied consent in this context. In my view, a legal parent gives implied consent to the formation of a *de facto* parental relationship where, as in this case, the legal parent for a significant period of time "voluntarily absented himself from [the children's lives]," *J.B.R.*, 336 P.3d at 654, leading to the foreseeable result that the other legal parent's partner filled the void left by the legal parent. As the Majority notes, the circumstances of this case differ from those of *J.B.R.*, *see* Maj. Op. at 64, but only by degrees. To be sure, the biological father in *J.B.R.* chose not to have a relationship with his daughter for over a decade, whereas, here, the record reflects that E.N. was effectively an "absent mother" for approximately two to four years. As E.N. reasonably should have foreseen, however, that was more than enough time for D.D.'s romantic partner to fill the maternal void that E.N. had left in her children's lives, if the partner chose to do so and if the children accepted her in a maternal role. Thus, I agree with the Court of Special Appeals that E.N.'s course of conduct at least "arguably manifests … implied consent." *E.N.*, 247 Md. App. at 247 n.11. The Majority's contrary determination will encourage legal parents in similar situations in the future to deliberately fail to learn details concerning their child's relationship with the other legal parent's

findings" in the best-interests analysis, "none of which [E.N.] challenges on appeal":

> • T.R. is a "wonderful mother," while [E.N.] "needs advice and guidance on daily parenting responsibilities."
>
> • Although T.R.'s request for custody is sincere, "the [c]ourt is less than convinced of [E.N.'s] sincerity."
>
> • The children expressed clear preference to live with T.R., and they told the court that "they felt abandoned by their mother" and saw T.R. as "their 'real' mother."
>
> • The children have developed friendships "in the neighborhood and school" while living with T.R., and they are thriving in school with T.R.'s assistance. [E.N.], on the other hand, "has trouble knowing and obtaining information about the children's activities," and "does not assist the ... children with their homework."
>
> • T.R. is an "integral part" of the children's lives and the "children have bonded and established a parent-child relationship with her."

*E.N.*, 247 Md. App. at 251-52. The Court of Special Appeals "discern[ed] no abuse of discretion in the court's decision to award primary physical custody of the children to T.R." *Id.* at 252. I would reach the same conclusion.

## Conclusion

The best interests of G.D. and B.D. are not furthered by the Court's holding allowing E.N. – who voluntarily absented herself from the children's lives for more than two years and who was not an active parent to the children when they lived with her before then – to sever T.R.'s parental-type bond with the children. T.R. formed that bond with the consent of their father and gave the children love and stability. T.R.'s bond with G.D. and B.D. is

---

partner, and later claim insufficient knowledge of the situation to provide implied consent to the formation of a parental-type relationship.

a relationship that this Court should respect. It exists. It cannot be ignored. By failing to give any weight to that bond, the Majority takes a position that necessarily will harm these two children and others in future cases. I cannot join an opinion that will lead to the severing of parental-type relationships without first giving a family court the opportunity to consider whether it is in the best interests of a child to allow a psychological parent to have some measure of access to the child and, thereby, keep intact the bond that has formed. Instead, I would hold that the consent of one legal parent is sufficient to establish the necessary "consent" under the first part of the *H.S.H.-K.* test.

Chief Judge Barbera has authorized me to state that she joins this opinion.